**Jack Harry SMITH, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 64412.**

Court of Criminal Appeals of Texas, En Banc.

July 11, 1984.

Rehearing Denied Oct. 10, 1984.

---

Will Gray (on appeal only), Houston, for appellant.

John B. Holmes, Jr., Dist. Atty., Ray Elvin Speece and Andy Tobias, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

ONION, Presiding Judge.

This is an appeal from a conviction for capital murder, where the punishment was assessed at death. See V.T.C.A., Penal Code, § 19.03; Article 37.071, V.A.C.C.P.

On appeal appellant contends that after the selection of five jurors his co-defendant, Hamilton, first agreed to become a State's witness, and the court erred in overruling his motions for mistrial, continuance and to leave to interrogate the five selected jurors on the law of accomplice witnesses, depriving him of due process and effective assistance of counsel. He also contends a prospective juror, Freeman, was excused in violation of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968); that the court erred in overruling his objections to the charge which combined two theories of criminal responsibility reducing the State's burden of proof when the evidence was undisputed he fired the fatal shots; that the court erred in admitting an attempted escape report from prison records; that the court erred in admitting an unadjudicated extraneous offense and the facts thereof at the penalty stage of the trial; that the evidence was insufficient to support the jury's affirmative answers to special issues numbers one and three submitted under Article 37.071, V.A.C.C.P.

Appellant concedes the evidence is sufficient to support the jury's determination of his guilt of the capital murder alleged. He acknowledges that the evidence was undisputed that he was the triggerman and fired the fatal shots resulting in the death of the deceased, Roy Deputter. Nevertheless, a brief recitation of the facts will place the grounds of error in proper perspective.

Jerome Hamilton testified that appellant, whom he had known for about seven months, spent the night of January 6, 1978 at his Pasadena apartment, and the next morning, January 7th, he and the appellant took appellant's car to the B & B Motors to have repairs made. There they met a "Jim" and Roy Hines, and a sawed-off shotgun and .38 caliber pistol were transferred from Jim's Cadillac to appellant's car. Hamilton stated they had talked to Jim two days earlier about acquiring weapons. He indicated he and appellant did not discuss with Jim and Hines a possible robbery at Corky's Corner, a convenience store, until that morning. Hamilton admitted that he and the appellant drove by the store once that morning "casing" it. About noon they drove to the store, and waited hoping the number of customers would diminish. Appellant loaded both the shotgun and .38 caliber pistol and gave the shotgun to Hamilton. Their plan was for appellant to go behind the counter and get the money, while Hamilton was to cover the rest of the store with his weapon. After waiting about 15 minutes, Hamilton and appellant entered the store armed. Appellant put on a ski mask and Hamilton pulled down a stocking hose over his face. Two teenage customers were told to move, and appellant walked around the counter. He

placed his pistol to the abdomen of Saddie Hollis, the store clerk, and demanded money. Hollis began emptying money from the cash register into a paper bag. Hamilton assumed a position in front of the counter.

About this time Roy A. Deputter, the deceased, entered the store via the back door. Hamilton told him to move to the front of the store. Hamilton's attention was diverted momentarily when a male customer entered the front door. When he turned back, Deputter was holding a pistol on him. Hamilton ducked just as Deputter fired at him. Hollis, meanwhile, ducked behind some display cases, still holding the bag of money. Hamilton heard two more shots, then saw Deputter stagger toward the front of the store, apparently wounded. Deputter fired again just as he slumped to the floor. The shot went wild.

Hollis heard one of the robbers inquire, "Where is that woman with the money?" She then threw the bag out into the open area of the store. Appellant picked it up and started to the front door, but dropped the bag, spilling the money. He and Hamilton picked up the bills or currency and left, taking Deputter's pistol with them. They fled in appellant's car, and then met Jim and Hines at a beer joint, and left there in Jim's Cadilla. The guns used were returned to Jim and the money was split four ways. Later that day appellant and Hamilton were arrested at Hamilton's apartment. Deputter's pistol was recovered.

Other witnesses, including Hollis, described the events of the robbery. Several identified Smith at the scene and others said he had the appearance of one of the robbers. As appellant concedes, the evidence is undisputed he fired the fatal shots.

The medical testimony showed that the deceased Deputter died as a result of two gunshot wounds, either of which would have been fatal. The wounds were consistent with having been inflicted by a .38 caliber pistol.

At the penalty stage of the trial it was shown that appellant had been previously convicted of five prior felonies. One such conviction was for felony theft, and the other four were for robbery by assault. For the last robbery conviction appellant had received a life sentence, and evidence was offered that while serving the life sentence he attempted to escape.

■ Initially we shall consider appellant's ground of error that "Appellant was denied his rights of due process of law and effective assistance of counsel under the Texas and United States Constitutions, where, after five jurors had been selected, the prosecution made an agreement with the co-defendant, Hamilton, to testify as a witness for the State, and the court refused to grant (1) a mistrial; (2) a continuance; and (3) leave to voir dire the five jurors already selected on the law applicable to the testimony of an accomplice witness."

The ground of error is clearly multifarious and does not comport with Article 40.09, § 9, V.A.C.C.P., presenting nothing for review. See *Wilson v. State*, 581 S.W.2d 661 (Tex.Cr.App.1979); *Ely v. State*, 582 S.W.2d 416 (Tex.Cr.App.1979); *Euziere v. State*, 648 S.W.2d 700 (Tex.Cr. App.1983). Nevertheless, in the interest of justice we shall try to identify and respond to the contentions as we understand them. See and cf. *Evans v. State*, 614 S.W.2d 414 (Tex.Cr.App.1981).

After five jurors were selected in appellant's capital murder case, see Article 35.17(2), V.A.C.C.P., the co-defendant, Hamilton, whose own trial had commenced almost a month earlier in another Harris County district court, entered a judicial confession in his trial implicating the appellant, and agreed to testify for the State in the appellant's case.[1] As soon as this occurred, appellant's counsel was immediately informed of the developments.

---

1. Subsequently at the trial on the merits Hamilton, an accomplice witness as a matter of law, testified the State had agreed to reduce the charge against him from capital murder to murder, had agreed to recommend a life sentence, and had agreed to wait filing of a federal charge and allow him to go first to a federal penal institution.

The next day appellant moved for a mistrial because he had been denied the right to make intelligent challenges for cause or make intelligent decisions regarding the use of peremptory challenges during the voir dire examination. The court withheld any ruling for one day, recessing the trial. The following day appellant's counsel acknowledged the State had been fair in making available to him its reports, that he was aware of the co-defendant's participation in the alleged offense, and had asked questions of the jury panel on the law of parties (V.T.C.A., Penal Code, § 1.02), but had not questioned the prospective jurors on the law of accomplice witness testimony (Article 38.14, V.A.C.C.P.) as he had not anticipated the co-defendant testifying. The State responded that it was not uncommon in criminal trials for evidence to raise unsuspected issues upon which the trial court would be required to charge the jury when the jury panel had not been voir dired on the principles of law involved. The motion for mistrial was overruled.

The appellant then orally moved for a continuance so that he might investigate and prepare to respond to the new evidence. The court noted that appellant had knowledge of the possibility of the co-defendant's testimony for almost two days, and that some time would elapse before jury selection was completed and the first witness called. The motion for continuance was denied. Appellant's counsel inquired if the five selected jurors would be recalled for further voir dire examination. The court declined to rule on that "specifically but the court is not so inclined." The court also declined at the time to rule on a request for eight additional peremptory challenges. No ruling was ever obtained on this request. Appellant did not exhaust all of his peremptory challenges.

■ Our law, of course, expressly provides for the examination of the jury panel, in order to enable counsel for both sides to intelligently exercise both peremptory challenges and challenges for cause. See *De La Rosa v. State*, 414 S.W.2d 668, 671 (Tex.Cr.App.1967); *Jones v. State*, 596 S.W.2d 134 (Tex.Cr.App.1980). Article 35.17, V.A.C.C.P. The constitutional right to the effective assistance of counsel, both federal and state, carries with it the right to interrogate members of the jury in order to intelligently exercise both peremptory challenges and challenges for cause. See *Mathis v. State*, 576 S.W.2d 835, 836 (Tex. Cr.App.1979); *Abron v. State*, 523 S.W.2d 405, 407 (Tex.Cr.App.1975); *De La Rosa v. State*, supra. Nevertheless, the trial court may impose reasonable restrictions on the exercise of voir dire examination. *McManus v. State*, 591 S.W.2d 505, 520 (Tex.Cr. App.1979), and cases there cited; *Clark v. State*, 608 S.W.2d 667 (Tex.Cr.App.1980).

Here appellant does not claim the court limited his right to interrogate prospective jurors about the law of accomplice witness testimony after he learned of the co-defendant's willingness to testify for the State, nor does he claim that he was prevented from so inquiring during the earlier part of the jury voir dire examination. He claims only that he did not anticipate that the issue would arise under the circumstances and should have been granted a mistrial or the right to further interrogate the five selected jurors when Hamilton agreed to testify for the State. The State argues appellant knew he was the triggerman, and there is always a possibility that a non-triggerman co-defendant may testify for the prosecution regardless of the circumstances.

■ We have carefully examined the cases cited by appellant, such as *Ham v. South Carolina*, 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973), and do not find any in point. In his argument appellant appears only to claim he was entitled to further interrogate the five selected jurors. Putting aside any question of the unilateral right to exercise a peremptory challenge as to an accepted juror, we cannot conclude the trial court abused its discretion under the circumstances in not allowing further interrogation of the jurors already chosen by both parties. We find no basis for the necessity of a mistrial.

■ The oral motion for continuance was properly overruled. *Carpenter v. State,* 473 S.W.2d 210 (Tex.Cr.App.1971). All motions for continuance must be in writing and sworn to. *Ford v. State,* 500 S.W.2d 827 (Tex.Cr.App.1973); *Porter v. State,* 623 S.W.2d 374, *cert. den.* 456 U.S. 965, 102 S.Ct. 2046, 72 L.Ed.2d 491; *Curtis v. State,* 640 S.W.2d 615 (Tex.Cr.App.1982). Article 29.08, V.A.C.C.P.

■ An accused is entitled to counsel likely to render and rendering reasonably effective assistance of counsel. *Ex parte Duffy,* 607 S.W.2d 507 (Tex.Cr.App.1980); *Ex parte Robison,* 639 S.W.2d 953 (Tex.Cr. App.1982), and this is true whether counsel is appointed or retained. *Ex parte Duffy,* supra. In determining whether counsel has met this standard, we look to the totality of the representation. *Romo v. State,* 631 S.W.2d 504 (Tex.Cr.App.1982); *Simmons v. State,* 629 S.W.2d 38 (Tex.Cr.App. 1981). Generally, ineffective assistance of counsel cannot be established by isolating or separating out one portion of the trial counsel's performance for examination. *Bolden v. State,* 634 S.W.2d 710 (Tex.Cr. App.1982); *Johnson v. State,* 629 S.W.2d 731 (Tex.Cr.App.1981). Allegations of ineffectiveness of counsel will be sustained only if they are firmly founded. *Romo v. State,* supra. And the constitutional right to counsel does not mean errorless counsel or counsel whose competency or adequacy of representation is to be judged by hindsight. *Mercado v. State,* 615 S.W.2d 225 (Tex.Cr.App.1981); *Boles v. State,* 598 S.W.2d 274 (Tex.Cr.App.1980).

■ Under the circumstances here presented, we cannot conclude the appellant was deprived of the effectiveness of counsel.[2] Further, considering appellant's contentions in their entirety, there was no

violation of due process. The ground of error is overruled.[3]

Next, we shall consider appellant's contention that prospective juror Patricia J. Freeman was excused for cause contrary to *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

In response to the court's interrogation, Freeman first stated she had conscientious scruples against capital punishment, and didn't know if she could participate in a verdict calling for the death penalty. She told the court that the death penalty could cause her to resolve facts differently than she might otherwise resolve them. She later gave a contra statement. Freeman then stated she could give the death penalty in the worst case she could think of if she thought it was the proper punishment. Later the prospective juror indicated some confusion as to whether she had understood and answered the question properly. The prosecutor then explained the oath that Freeman must take under Article 35.-22, V.A.C.C.P.,[4] and inquired if her beliefs about the death penalty would interfere with such oath if she was chosen as a juror. The record then reflects:

"THE COURT: What he (the prosecutor) is asking you really is can you set aside your personal beliefs and follow the law as given to you by the Court or would your own personal beliefs cause you in your deliberations as a juror to decide a fact issue differently from the way you might otherwise decide it?

"A. Yes, they would."

Later in response to appellant's counsel Freeman stated she would not let her personal beliefs affect her fact determination of issues if the State had proven them beyond a reasonable doubt. The appel-

---

**2.** Appellant was represented by three attorneys at trial.

**3.** It is observed that the court in its charge instructed the jury on the law of accomplice witnesses (Article 38.14, V.A.C.C.P.), and told the jurors Hamilton was an accomplice witness as a matter of law.

**4.** Article 35.22, V.A.C.C.P., provides:

"When the jury has been selected, the following oath shall be administered them by the court or under its direction. 'You and each of you do solemnly swear that in the case of the State of Texas against the defendant, you will a true verdict render *according to the law and the evidence,* so help you God.'" (Emphasis supplied.)

lant's counsel then suggested the prospective juror was "rehabilitated." The record then reflects:

"Q. (by prosecutor) Now, we are kind of back into the ball park because you told me one thing—

"A. I am so confused by the terminology and the way you are speaking things I thought I answers that question no, and I am sitting here thinking maybe it's a different question.

\* \* \* \* \* \*

My conscience—I don't want it on my conscience that I have given anybody a death penalty. Therefore I believe the beliefs I have could change my answers.

"THE COURT: It would affect your deliberations?

"A. It would affect my deliberations, yes.

"THE COURT: It would cause you to resolve a fact issue differently from the way you would otherwise resolve it?

"A. Yes, it—I might twist it in my mind.

"THE COURT: It's whether or not you would resolve it differently, Mrs. Freeman.

"A. Yes.

"THE COURT: You would? All right."

The State then challenged for cause.

Appellant's counsel then inquired:

"Q. ... it is my understanding then that you would let your personal belief affect your determination of a fact issue if you know death was a possible punishment?

"A. Yes."

Thereafter, the court excused Mrs. Freeman without objection.

In *Witherspoon v. Illinois*, supra, the United States Supreme Court held that a prospective juror may not be excluded by the trial court for cause unless that person makes it absolutely and unmistakably clear that 1) he would automatically vote against the imposition of capital punishment no matter what the trial might reveal, or 2) that the prospective juror's attitude towards the death penalty would prevent him from making an impartial decision as to the defendant's guilt.

In *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), the question presented was whether Texas contravened the Sixth and Fourteenth Amendments of the United States Constitution as construed and applied in *Witherspoon* when it excluded members of the venire from jury service because they were unable to state under oath as prescribed by V.T.C.A., Penal Code, § 12.31(b), that the mandatory penalty of death or life imprisonment in a capital murder case would not affect their deliberations on any issue of fact.

The United States Supreme Court reversed the *Adams* conviction and set aside the death penalty imposed holding that *Witherspoon* and said § 12.31(b) may not co-exist as separate and independent bases for excluding prospective jurors so as to permit exclusion under § 12.31(b) on a ground broader than permitted by *Witherspoon*. The Court noted, however, that although the State could, consistent with *Witherspoon* use § 12.31(b) to exclude prospective jurors whose views in capital punishment are such as to make them unable to follow the law or obey their oaths.[5]

In *Adams* the Court, referring to note 21 of the *Witherspoon* opinion, stated:

"This statement seems clearly designed to accommodate the State's legitimate interest in obtaining jurors who could follow their instructions and obey their oaths. For example, a juror would no doubt violate his oath if he were not impartial on the question of guilt...

"[T]he general proposition [is] that a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance

---

**5.** See now *Evans v. State,* 614 S.W.2d 414 (Tex. Cr.App.1980).

with his instructions and his oath. The State may insist, however, that jurors will consider and decide the facts impartially and conscientiously apply the law as charged by the court.

\* \* \* \* \* \*

If the juror is to obey his oath and follow the law of Texas, he must be willing not only to accept that in certain circumstances death is an acceptable penalty but also to answer the statutory questions without conscious distortion or bias. The State does not violate the Witherspoon doctrine when it excludes prospective jurors who are unable or unwilling to address the penalty questions with this degree of impartiality.

\* \* \* \* \* \*

"We repeat that the State may bar from jury service those whose beliefs about capital punishment would lead them to ignore the law or violate their oaths."

In *Williams v. State*, 622 S.W.2d 116, 118 (Tex.Cr.App.1981), it was held that certain veniremen whose views on the death penalty would have prevented or substantially impaired their performance as jurors in accordance with their instructions were properly excused in light of *Witherspoon* and *Adams*. See also *Bass v. State*, 622 S.W.2d 101, 108 (Tex.Cr.App.1981); *Porter v. State*, 623 S.W.2d 374 (Tex.Cr.App.1981); *Griffin v. State*, 665 S.W.2d 762 (Tex.Cr.App.1983).

█ In the instant case the prospective juror went beyond stating her beliefs about capital punishment would affect her deliberations, which would not have disqualified her, see *Rougeau v. State*, 651 S.W.2d 739 (Tex.Cr.App.1982), but stated that those beliefs would cause her to resolve a fact issue differently than she would otherwise. While it would have been better if the prospective juror had answered as the jurors did in *Williams v. State*, 622 S.W.2d 116 (Tex.Cr.App.1981), we conclude that Freeman's beliefs would have prevented or substantially impaired her performance as a juror in accordance with the court's instructions and the court did not abuse its discretion in sustaining the State's challenge for cause. See *Williams v. State*, supra; *Bass v. State*, supra. Further, at first Freeman was an "equivocating juror" and it must be remembered that the trial judge heard the tone of her voice and observed her demeanor and was in the better position to pass on the challenge for cause presented. See *Tezeno v. State*, 484 S.W.2d 374 (Tex.Cr.App.1972); *Villarreal v. State*, 576 S.W.2d 51 (Tex.Cr.App.1978).

Still further, as noted, appellant made no objection on the basis of *Witherspoon* or any other ground or basis. Nothing is presented for review. See *Boulware v. State*, 542 S.W.2d 677 (Tex.Cr.App.1976); *Bass v. State*, supra; *May v. State*, 618 S.W.2d 333 (Tex.Cr.App.1981); *White v. State*, 629 S.W.2d 701 (Tex.Cr.App.1981). Appellant does cite *Adams v. Texas*, supra. The voir dire examination here occurred prior to *Adams*, but it is observed that the basis for excusal of the prospective juror was on a ground independent of *Witherspoon* and § 12.31(b). The ground of error is overruled.

The appellant Smith also contends the "court erred in overruling Smith's objections to the charge which combined the theory of criminal responsibility contained in V.T.C.A., Penal Code, § 7.02(b) (Conspiracy), with the theory of criminal responsibility for the acts of another in V.T.C.A., Penal Code, § 7.02(a)(2), where the evidence was undisputed that Smith fired the shots that caused the death of the deceased and the charge materially reduced the State's burden of proof."

Appellant tells us that his ground of error relates to his objections to paragraphs 2, 3, 4, 6 and 7 of the court's charge at the guilt stage of the trial. Putting aside any question that the ground of error is multifarious and not in conformity with Article 40.09, § 9, V.A.C.C.P., we shall consider the contention.

█ First, we observe that the objections to the numbered paragraphs of the charge was on the basis that the evidence

did not raise the issues and that the court should not have charged on such issues. The complaint or complaints now urged on appeal are not the same as those urged upon the trial court. This court has consistently held that to present error on appeal the objection at trial must be the same or similar to the ground of error raised on appeal. See *Simpkins v. State,* 590 S.W.2d 129, 135 (Tex.Cr.App.1979); *Bouchillon v. State,* 540 S.W.2d 319 (Tex.Cr.App.1976); *Lejeune v. State,* 538 S.W.2d 775 (Tex.Cr. App.1976).

While the court need not have charged as it did, the evidence did raise the issues, and we do not understand the appellant to contend otherwise on appeal.

In paragraph two the court abstractly charged on the law of parties [V.T.C.A., Penal Code, § 7.01(a) ], and the law of criminal responsibility for conduct of another under V.T.C.A., Penal Code, § 7.02(a)(2) (acting with intent to promote or assist, etc.), and § 7.02(b) (Conspiracy).

In paragraphs three and four the court applied the laws of parties, criminal responsibility and conspiracy to the facts. It appears that the paragraphs are duplications of each other except that paragraph three contains the additional words "and in furtherance of the unlawful purpose, if any." Appellant candidly admits that the lawyers did not detect the duplication. We further observe that except the quoted language above paragraph three was lined or struck out. Whether the charge was received by the jury in this form is not known.

It is observed that a somewhat similar charge was given in *English v. State,* 592 S.W.2d 949 (Tex.Cr.App.1980).[6] There the death penalty was upheld, this court finding no fundamental error in the charge. There the capital murder had occurred in the course of a robbery. In *English* one paragraph (4) related to the shooting of the deceased by English during a conspiracy, and another related to the shooting of the deceased by co-defendant McGill during a conspiracy with English. In the instant case both paragraphs of the charge related only to the shooting of the deceased by the appellant.

In paragraph five of the instant charge, to which appellant did not object, the court charged the jury:

"Before you would be warranted in convicting the defendant, Jack Harry Smith, of capital murder, you must find from the evidence beyond a reasonable doubt not only that Jack Harry Smith with Jerome Hamilton on the occasion in question were engaged in the commission of the felony offense of aggravated robbery or attempted aggravated robbery of Saddie Hollis as defined in this charge, but also that during the commission of the aggravated robbery, if any, Jack Harry Smith shot Roy A. Deputter with the intention of killing him. Unless you find from the evidence beyond a reasonable doubt that Jack Harry Smith on the occasion in question specifically intended to kill the said Roy A. Deputter when he shot him, if he did, and unless you find from the evidence beyond a reasonable doubt that said act, if any, was committed in the course of committing or attempting to commit aggravated robbery, you cannot convict Jack Harry Smith of the offense of capital murder. If you have such a reasonable doubt, you will acquit Jack Harry Smith of capital murder."

An almost identical paragraph in the charge in *English*[7] was held to redeem the court's charge. The question there was of fundamental error as there was no objection to the charge. In the instant case there were objections directed to the fact the evidence did not raise the issues, which was not true, and which are not the same as raised on appeal. Further, as appellant acknowledges, the evidence was undisputed

---

6. *English* was tried in the same trial court as the instant case. The instant case was tried, however, before the *English* decision by this court.

7. The names of the parties were, of course, different, and the offense of capital murder was committed in the course of the robbery in *English* rather than aggravated robbery in the instant case.

he fired the shot that caused the death of the deceased.

Appellant also calls attention to paragraphs six and seven. These were defensive instructions. Paragraph six told the jury that if they found the appellant did not act as a party or did not enter into a conspiracy, or had a reasonable doubt thereof, to acquit the appellant of capital murder. The instruction also informed the jury that mere presence at the scene would not constitute appellant a party to the offense. Paragraph seven instructed the jury that if it found the appellant, acting alone or as a party or in furtherance of a conspiracy, did intentionally cause the death of the deceased but not while engaged in commission of aggravated robbery or attempted aggravated robbery to acquit him of capital murder.

 The charge was clearly no paragon of draftsmanship, but viewing the charge as a whole, see *Jackson v. State*, 591 S.W.2d 820 (Tex.Cr.App.1979), we do not find the error, if any, mandates reversal under the circumstances. Appellant's ground of error is overruled.

Appellant urges he was denied his rights of cross-examination and confrontation at the penalty stage when the State was permitted to introduce a certified copy of an "Attempted Escape Disciplinary Report" from the records of the Texas Department of Corrections containing details of the purported escape attempt. Appellant contends this hearsay report lacked the indicia of reliability necessary to insure the integrity of the fact-finding process and overrode his rights under the state and federal constitutions.

At the penalty stage of the trial the State introduced a certified copy of the said report dated February 27, 1963, relating to Jack Harry Smith, No. 154,244, Eastham Unit, which read in part:

"On the morning of February 25, 1963, at about 3:00 a.m., the above named inmate together and in concert with [five other named inmates] attempted to escape by sawing out the ventilator in his cell, going through the fan on the roof,

dropping from the building, and over the fence. Inmate Smith succeeded in escaping from the yard and remained at large until apprehended by Department of Corrections officers about 6:30 a.m. on February 25."

The foregoing was followed by the statement: "To the best of my knowledge the above is a true and correct statement of the charges." The signature of the warden followed.

The report also reflects above a second signature of the warden that the charge was attempted escape, the punishment assessed, "solitary confinement," and the recommendation was that all overtime be forfeited, and "demoted to Class III and 320 points forfeited." The report also reflects the Disciplinary Committee Recommendation dated March 7, 1963 that all overtime and 320 points be forfeited, inmate demoted to Class III, released from solitary confinement and transferred to the Ellis Unit.

When the report was offered, the objections were that the report did not show any acts of violence and it would not aid the jury in answering the "punishment questions"; that it contained a recitation of facts rather than just a conviction; that the report reflects a proceeding conducted without due process of law and without right of counsel and right of confrontation. Appellant candidly acknowledges no specific trial objection was made that the report was hearsay.

The State argues that the objections at trial are not the same as the complaint now raised on appeal and that nothing is presented for review. *Simpson v. State*, 507 S.W.2d 530 (Tex.Cr.App.1974), is cited. While the trial objections are not on all fours with the contention now urged, we shall consider that ground of error.

Article 37.071(a), V.A.C.C.P., provides:

"... In the proceeding, evidence may be presented as to *any matter* that the court deems *relevant to sentence*. This subsection shall not be construed to authorize the introduction of any evidence secured in violation of the Constitution of

the United States or of the State of Texas." (Emphasis supplied.) [8]

■■■ Thus the trial court at the penalty stage of a capital murder trial has wide discretion in admitting or excluding evidence. *Robinson v. State*, 548 S.W.2d 63 (Tex.Cr.App.1977); *Felder v. State*, 564 S.W.2d 776 (Tex.Cr.App.1978), *cert. den.* 440 U.S. 950, 99 S.Ct. 1433, 59 L.Ed.2d 640; *Hammett v. State*, 578 S.W.2d 699 (Tex.Cr. App.1979); *McManus v. State*, 591 S.W.2d 505 (Tex.Cr.App.1979); *Sanne v. State*, 609 S.W.2d 762 (Tex.Cr.App.1980). See also *Green v. State*, 587 S.W.2d 167 (Tex.Cr. App.1979).

However, it has been said that this discretion extends only to the question of the relevance of the facts sought to be proved, and that Article 37.071(a), supra, does not alter the rules of evidence insofar as the manner of proof is concerned. See *Porter v. State*, 578 S.W.2d 742, 748 (Tex.Cr.App. 1979).

■■■ It has been consistently held that evidence of unadjudicated extraneous offenses are admissible at the penalty stage of a capital murder trial absent showing of unfair surprise. *Quinones v. State*, 592 S.W.2d 933 (Tex.Cr.App.1980), ·cert. den. 449 U.S. 893, 101 S.Ct. 256, 66 L.Ed.2d 121; *Crawford v. State*, 617 S.W.2d 925 (Tex.Cr. App.1980); *Rumbaugh v. State*, 629 S.W.2d 747 (Tex.Cr.App.1982). And such admission does not render the proceedings fundamentally unfair or deprive an accused of due process and equal protections of the laws. *Williams v. State*, 622 S.W.2d 116 (Tex.Cr.App.1981), *cert. den.* 455 U.S. 1008, 102 S.Ct. 1646, 71 L.Ed.2d 876. See also *Garcia v. State*, 581 S.W.2d 168 (Tex.Cr. App.1979).

In *Green v. State*, 587 S.W.2d 167 (Tex. Cr.App.1979), it was held under Article 37.-071, supra, that it was within the discretion of the court to admit the testimony of a deputy sheriff showing details of a similar murder committed approximately one month after the charged offense including verbal description of the body of the subsequent victim.

And in *Davis v. State*, 597 S.W.2d 358 (Tex.Cr.App.1980), cert. den. 101 S.Ct. 388, this court held that it was not error in a capital murder trial for the court, after admitting four prior convictions of the defendant, to permit the State to call witnesses to testify as to the details of the events which formed the bases of the prior convictions.

There appears little doubt that the State could have called witnesses to testify as to the attempted escape while appellant was in the Department of Corrections on a life sentence for robbery by assault. The question remains whether the State could utilize the certified copy of the attempted escape report as it did.

Turning to the admissibility of the certified copy of the escape report from the Department of Corrections, which the State urges was admissible under Article 3731a, V.A.C.S., much of what was written in *Porter v. State*, 578 S.W.2d 742, 745, 746 (Tex. Cr.App.1979), is here deemed pertinent.

In *Porter* we wrote:

·"The right to cross-examine witnesses is implicit within the right to confrontation provided by the Sixth Amendment to the Constitution of the United States as applied through the Fourteenth Amendment. *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); *Dutton v. Evans*, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970); *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); *Smith v. Illinois*, 390 U.S. 129, 88 S.Ct. 748, 19 L.Ed.2d 956 (1967); *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965); *Douglas v. Alabama*, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965). The right to confront and cross-examine witnesses has also been held to be essen-

---

**8.** In *Earvin v. State,* 582 S.W.2d 794, 799 (Tex. Cr.App.1979), this court wrote:

"Under Article 37.071(a), V.A.C.C.P., the court is authorized to admit any evidence which is relevant to the punishment, and the jury is authorized to consider this relevant evidence along with that adduced at the guilt-innocence phase of the trial."

tial to due process and a fair trial within the provisions of the Fourteenth Amendment to the Constitution of the United States. E.g., *In Re Oliver*, 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682 (1948) and *Chambers v. Mississippi*, supra.

"However, the rights of confrontation and cross-examination are not absolute. *Chambers v. Mississippi*, supra; *Mancusi v. Stubbs*, 408 U.S. 204, 92 S.Ct. 2308, 33 L.Ed.2d 293 (1972); *Dutton v. Evans*, supra; *California v. Green*, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). Confrontation and cross-examination are not essential where the evidence bears the indicia of reliability sufficient to insure the integrity of the fact finding process. *Dutton v. Evans*, supra; *Mancusi v. Stubbs*, supra; *Kay v. United States*, 255 F.2d 476 (4th Cir.1958). Cf. *Chambers v. Mississippi*, supra; *California v. Green*, supra; *Berger v. California*, 393 U.S. 314, 89 S.Ct. 540, 21 L.Ed.2d 508 (1969).

"If the rights of confrontation and cross-examination were absolute, none of the exceptions to the hearsay rule would apply in criminal cases. In almost every criminal case, evidence is admitted under one of the exceptions to the hearsay rule. Official written instruments are admissible as one of the well recognized exceptions. They are admissible in this state under the provisions of Article 3731a, V.A.C.S., which reads, in pertinent part:

"'Sec. 2. Any written instrument which is permitted or required by law to be made, filed, kept or recorded (including but not limited to certificate, written statement, contract, deed, conveyance, lease, concession, covenant, grant, record, return, report or recorded event) by an officer ... of the United States ... or of any governmental subdivision of any of the foregoing, or by his deputy or employee ... in the performance of the functions of his office, shall so far as relevant, be admitted in the courts of this State as evidence of the matter stated therein ...'

The State contends that the five documents in question are official written instruments, and were properly admitted under this statute.

"Article 3731a, supra, is applicable in criminal cases. *Phillips v. State*, 538 S.W.2d 116 (Tex.Cr.App.1976); *Trevino v. State*, 464 S.W.2d 859 (Tex.Cr.App. 1971); *Spencer v. State*, 164 Tex.Cr.R. 464, 300 S.W.2d 950 (1957); *Fite v. State*, 158 Tex.Cr.R. 611, 259 S.W.2d 198 (1953). However, in some circumstances, evidence within the ambit of a recognized exception to the hearsay rule is not admissible if it does not have the indicia of reliability sufficient to insure the integrity of the fact finding process commensurate with the constitutional rights of confrontation and cross-examination. *Chambers v. Mississippi*, supra; *Barber v. Page*, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968); *Berger v. California*, supra; *McDaniel v. United States*, 343 F.2d 785 (5th Cir.1965); *Phillips v. Neil*, 452 F.2d 337 (6th Cir.1971).

"This Court has previously recognized that evidence within the scope of the Business Records Act, Article 3737e, V.A.C.S., is not admissible if it does not have sufficient indicia of reliability. *Coulter v. State*, 494 S.W.2d 876 (Tex.Cr. App.1973); *Battee v. State*, 543 S.W.2d 91 (Tex.Cr.App.1976); *Sisson v. State*, 561 S.W.2d 197 (Tex.Cr.App.1978). The same rule is applicable to official records sought to be admitted under Article 3731a, supra. It must be determined in each instance whether the particular record is of such trustworthiness as to guarantee the same protection provided by the constitutional rights of confrontation and cross-examination. The particular record and its relationship to the particular case in which it is offered are a part of the circumstances to be considered in determining whether the record has the indispensable fundamental trustworthiness necessary for its admission into evidence. See e.g., *United States v. Lipscomb*, supra; *McDaniel v. United States*, supra; *People v. Aguilar*, 16 Cal.App.3d, 1001, 94 Cal.Rptr. 492

(1971); *Johnson v. State*, 253 A.2d 206 (Del.1969); *People v. Crant*, 42 Misc.2d 350, 248 N.Y.S.2d 310 (1964)."

In *Porter* the court explained why the documents admitted in that case did not have the indicia of reliability to insure the integrity of the fact finding process commensurate with the constitutional rights of confrontation and cross-examination.

In the instant case the report alleging an attempted escape by the appellant, but certainly not in elaborate detail, was made and subscribed by the Warden, Eastham Unit, Texas Department of Corrections on February 27, 1963. The attempted escape is alleged to have occurred on February 25, 1963. The recommendation of the disciplinary committee was dated March 7, 1963. It is apparent that all entries were made within two weeks of the date of the alleged attempted escape. It was made by the warden of the prison unit where the attempted escape was alleged to have occurred. Further, the chronological proximity of the report and the event to which it refers lends credence to the matters contained therein. It was clearly a document prepared by an official of the Texas Department of Corrections in the systematic administration of his office. It records a concrete event and does not include speculation from anonymous sources.

■ While the State may well have been skating on thin ice in utilizing the report in place of witnesses, we conclude under the circumstances that the report had the indicia of reliability to insure the integrity of the fact finding process. It was admissible under Article 3731a, V.A. C.S.

■ Appellant admits he did not object at trial on the grounds of hearsay, and he did not object that the introduction of the report itself would deprive him of his rights of confrontation and cross-examination. One trial objection was that the report did not reflect an act of violence and would not aid the jury on the punishment questions. It is, of course, not necessary that all evidence relate to an act of violence

before it be relevant and admissible under Article 37.071(a), supra. Another objection was that the report contained a recitation of facts rather than a conviction. As we have seen, extraneous offenses and details thereof are admissible at the penalty stage of a capital murder trial. The only other objection was that the report reflects a proceeding conducted without right to counsel, right of confrontation of witnesses, and without due process of law. The report does not reflect that any proceeding was had. It does refer to a disciplinary committee recommendation, but whether the recommendations were carried out is not reflected by the report or this appellate record. We are aware of *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), creating minimum due process safeguards for prison disciplinary hearings. However, *Wolff*, as well as *Cox v. Cook*, 420 U.S. 734, 95 S.Ct. 1237, 43 L.Ed.2d 587 (1975), held that these rights would not be imposed retroactively to hearings held prior to the date *Wolff* was decided. If in fact there was a prison hearing in 1963, it would not have to meet the requirements of *Wolff*. We fail to see how the court erred in overruling the objections made at trial to the report in question.

■ If it can be validly argued that the admission of the attempted escape report was error, we undertake to determine if the error was harmless. In making this determination the question is whether there is a reasonable possibility that the introduction of the attempted escape report might have contributed to the verdict. *Sanne v. State*, 609 S.W.2d 762, 774 (Tex. Cr.App.1980). See *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); *Cunningham v. State*, 500 S.W.2d 820 (Tex.Cr.App.1973). The facts and circumstances in each case must be looked to in formulating a decision. In addition to the facts at the guilt stage of the trial, proof was offered at the penalty stage of five prior felony convictions, a theft and four robbery by assault convictions, the last of which involved a life sentence. Our

examination of the entire record leads us to conclude that the error, if any, was harmless beyond a reasonable doubt. *Harrington v. California*, supra; *Sann v. State*, supra. The ground of error is overruled.

Appellant urges the evidence is insufficient to support the jury's affirmative answer to special issue number one (submitted under Article 37.071, V.A.C.C.P.) at the penalty stage of the trial that his conduct that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would occur.

 In answering special issues under Article 37.071, supra, at the penalty stage of a capital trial, the jury may consider all of the evidence adduced at the guilt stage of the trial, as well as that introduced at the penalty stage. *Bravo v. State*, 627 S.W.2d 152 (Tex.Cr.App.1982). In fact, circumstances of the offense itself can sustain an affirmative answer to a special issue submitted under Article 37.-071, supra. See *Mitchell v. State*, 650 S.W.2d 801 (Tex.Cr.App.1983).

 The record shows that appellant and Hamilton secured their weapons from a third party for the express purpose of committing the robbery. Upon arriving at the store, they sat in the car and loaded their guns. They waited until the volume of customers had diminished, then went in with their disguises. During the course of the robbery, the deceased Deputter entered the store. He drew a pistol and fired at Hamilton. Appellant then fired one or two shots at the deceased, killing him.

It is also significant that the jury had at its disposal evidence of four prior convictions of the appellant for robbery by assault. The evidence shows the killing was done by an experienced robber, rather than an excited amateur.

 Appellant urges the State was bound to prove that he "carefully weighed or considered" or "studied" the situation immediately prior to killing the deceased.

Just such a contention was rejected in *Granviel v. State*, 552 S.W.2d 107, cert. den. 431 U.S. 933, 97 S.Ct. 2642, 53 L.Ed.2d 250 (1976). We adhere to *Granviel.*

Viewing the evidence in the light most favorable to the jury's finding, see and cf. *Jackson v. Virginia*, 443 U.S. 307, 319, n. 12, 99 S.Ct. 2781, 2789, n. 12, 61 L.Ed.2d 560 (1979), and *Wilson v. State*, 654 S.W.2d 465 (Tex.Cr.App.1983) (Opinion on rehearing), we find the evidence sufficient to support the jury's affirmative answer to special issue number one. See *King v. State*, 631 S.W.2d 486 (Tex.Cr.App.1982), cert. den. 459 U.S. 928, 103 S.Ct. 238, 74 L.Ed.2d 188); *Milton v. State*, 599 S.W.2d 824 (Tex. Cr.App.1980), cert. den. 45 U.S. 1031; *Rumbaugh v. State*, 629 S.W.2d 747 (Tex. Cr.App.1982); *Fearance v. State*, 620 S.W.2d 577 (Tex.Cr.App.1980), cert. den. 454 U.S. 899, 102 S.Ct. 400, 70 L.Ed.2d 215.

 The appellant also argues that the evidence was insufficient to support the jury's affirmative answer to special issue number three at the penalty stage of the trial that his conduct in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.

Much of what has been written with regard to the preceding ground of error is here applicable.

Appellant urges that however otherwise culpable he may be the deceased's own "foolhardy" attempt to foil the robbery precludes appellant's receiving the death penalty. While admitting that a robber has no right of self-defense, see *Davis v. State*, 597 S.W.2d 388 (Tex.Cr.App.1980), he contends the evidence of provocation by the deceased was so overwhelming the jury could not properly have answered "yes" to special issue number three submitted under Article 37.071, supra. He argues that the deceased's firing at Hamilton and also wounding him was a mitigating factor that cannot be ignored. In viewing the evidence in the light most favorable to the jury's answer,[9] we find it sufficient to support the affirmative answer to special issue number

9. See *Jackson v. Virginia,* supra; *Wilson v. State,* supra.

three. See *Smith v. State*, 540 S.W.2d 693 (Tex.Cr.App.1976), *cert. den.* 430 U.S. 922, 97 S.Ct. 1341, 51 L.Ed.2d 601.

The ground of error is overruled.

The judgment is affirmed.

CAMPBELL, Judge, concurring.

I find myself today concurring in the majority opinion for the reasons that I expressed in my dissenting opinion in *Mead v. State*, 656 S.W.2d 494 (Tex.Cr.App.1983).

The plight of venireperson Freeman in the case sub judice has become the rule rather than the exception in capital murder voir dire. At various times in various cases, this Court has labeled venirepersons, caught in the same plight as Freeman, as "equivocating jurors." Freeman's ultimate frustration with the entire process was never more succinctly addressed than in her answer to a prosecution question:

"A. I am so confused by the terminology and the way you are speaking things I thought I, answers that question no, and I am sitting here thinking may be it's a different question." [At 386].

The attorneys representing the State and the appellant were understandably attempting to elicit differing answers from Freeman in their quest to either qualify or disqualify her. As was the case in *Mead*, supra, each attorney succeeded in getting conflicting answers from the venireperson, and appellant's counsel contended that she was "rehabilitated" at one point.

The majority ultimately throws in the towel and finds that Freeman was an "equivocating juror" in the beginning [P. 387, even though she made her views on the death penalty expressly known to anyone who would listen.

As Presiding Judge Onion correctly notes, however:

"It must be remembered that the trial judge heard the tone of her voice and observed her demeanor and was in the better position to pass on the challenge for cause presented." Slip Opinion at p.

12, citing *Tezeno v. State*, 484 S.W.2d 374 (Tex.Cr.App.1972) and *Villarreal v. State*, 576 S.W.2d 51 (Tex.Cr.App.1978).

I write this concurring opinion primarily to put an exclamation point on Presiding Judge Onion's language in the majority, and to urge my brethren to breathe new life into the trial judge's role in the conduct of capital murder voir dire.

We need only look back six years, to *Hughes v. State*, 563 S.W.2d 581 (Tex.Cr. App.1978), *cert. den.* 440 U.S. 950, 99 S.Ct. 1432, 59 L.Ed.2d 640, wherein a majority of this Court, speaking through Judge Tom Davis, opined:

"We must be mindful that where we only have a cold record before us the trial judge in passing on the answers of the 'equivocating venireman' has the opportunity to observe the tone of voice and demeanor of the prospective juror in determining the precise meaning intended." at 585, citing *Tezeno*, supra.

Though I would have preferred that the majority address the issue of what quantum of deference this Court would accord the trial judges of this state in the arena of capital murder voir dire, see *Mead*, supra [Dissenting opinion at p. 16], I join the reasoning and judgment of the Court.

McCORMICK, J., joins in this concurring opinion.

CLINTON, Judge, dissenting.

One must be perpetually amazed about what a majority of this Court will next label "equivocation" on the part of prospective capital jurors.

Construing the record of Freeman's voir dire [1] in a fashion most liberal to the exclusion, her pertinent attitudes are clearly reflected to be as follows:

(1) It would rest on her conscience to sentence someone to death;

(2) She could participate in returning a capital sentence in a proper case;

1. A complete compendium of Freeman's voir dire appears in an Appendix to this opinion.

(3) The possibility of the death penalty would cause her to resolve fact issues "differently" than in a noncapital case;

(4) Her beliefs "might interfere" with her deliberations;

(5) She believed her attitude "could change" her answers;

(6) She would let her personal belief "affect" her determination of fact issues.

So, where is the "equivocation?" [2]

It was just such a juror whom the Supreme Court acknowledged in *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968),[3] then later in *Adams v. Texas*, 448 U.S. 38, 39, 100 S.Ct. 2521, 2523, 65 L.Ed.2d 581 (1980),[4] a capital defendant has a Sixth Amendment right to have serve on his jury, absent a showing by the challenging party that the juror's objections to the death penalty would lead her to ignore the law or violate her oath.

Far from making it "unmistakably clear"[5] that she would invariably vote so as to avoid the death penalty regardless of the evidence, Freeman's attitudes seem more akin to those of jurors excused in *Adams v. State*, 577 S.W.2d 717 (Tex.Cr. App.1979), the exclusion of whom was finally condemned in *Adams v. Texas*:

"... [I]t is apparent that a Texas juror's views about the death penalty *might influence the manner in which he performs his role* but without exceeding the 'guided jury discretion' ... permitted under Texas law. In such circumstances, he could not be excluded consistently with *Witherspoon*. Exclusions under § 12.31(b), *like other exclusions,* [6] must be examined in this light."

*Adams*, 448 U.S. at 46–47, 100 S.Ct. at 2526–27.

Freeman, like jurors in *Adams*,

"apparently meant only that the potentially lethal consequences of [her] decision would invest [her] deliberations with greater seriousness and gravity or would involve [her] emotionally. * * * But neither nervousness, emotional involvement nor inability to deny or confirm any effect whatsoever is equivalent to an unwillingness or an inability on the part of the jurors to follow the court's instructions and obey their oath."

*Adams*, at 49–50, 100 S.Ct. at 2528–29.

The Supreme Court likewise rejected as unconstitutional the exclusion of jurors, such as Freeman, who "aver that they will honestly find the facts and answer the questions in the affirmative if they are convinced beyond reasonable doubt, but not otherwise, *yet who frankly concede that prospects of the death penalty may affect*

2. "Equivocal" is defined as "subject to two or more interpretations and usually used to mislead or confuse ...; of uncertain nature or classification; of uncertain disposition toward a person or thing: UNDECIDED." Webster's New Collegiate Dictionary (1979).

3. Hereinafter *Witherspoon.*

4. Hereinafter *Adams* or *Adams v. Texas.*

5. *Witherspoon*, 391 U.S. at 522, 88 S.Ct. at 1777.

6. The majority's final disclaimer—"it is observed that the basis for excusal of [Freeman] was on a ground independent of *Witherspoon* and § 12.31(b)"—sounds all too familiar. It is truly distressing to see such a statement by this Court almost four years after *Adams v. Texas*.

Long ago I acknowledged that if jurors were no longer called upon to assess a death sentence, but instead answer statutory questions

solely and strictly on the basis of evidence, then their attitudes regarding the death penalty were, technically, irrelevant, and *Witherspoon* concerns need not come into play in Texas. *Russell v. State*, 598 S.W.2d 238 (Tex.Cr.App.1980) (Opinion dissenting). Before the Supreme Court of the United States, the State Attorney General conceded that under our special issue scheme, the application of *Witherspoon* "is questionable as matter of 'logic.'" *Adams*, 448 U.S. at n. 4. And though the application of *Witherspoon* to our bifurcated procedure was the first question fashioned by the Court for itself in *Adams*, that Court had "little difficulty in concluding [the] rule applies" in Texas, no doubt partially because the State agreed "that Texas experience and case law conclusively demonstrate *Witherspoon's* applicability." *Id.* 448 U.S. at n. 4.

(All emphasis is supplied throughout by the writer of this opinion unless otherwise indicated.)

*what their honest judgment of the facts will be or what they may deem to be a reasonable doubt." Adams*, at 50 U.S.

In other words, a prospective juror may not be excluded solely because she might treat issues in a capital case "differently" from those presented in a noncapital case.[7]

This leaves only the prosecutor's version of § 12.31(b) as a possible justification for the exclusion of Freeman: that her attitudes toward the death penalty "might interfere" with her deliberations.

Whatever significance this may have had to the prosecutor in 1978, it clearly is not tantamount to a statement that Freeman would consciously distort the answers to the statutory special issues, be unable to follow the law or unwilling to abide by her oath.

For this Court to pretend Freeman was excluded for any reason other than what it had repeatedly approved by 1978 for applying § 12.31(b), is an exercise in selfdeception.

If the record really reflected "equivocation" on the part of Freeman so that a studied reading of her examination failed to reveal her true attitudes, I would be as willing as anyone to defer to the trial court's personal observation of her responses. See *Hernandez v. State*, 643 S.W.2d 397 (Tex.Cr.App.1982) (Opinion dissenting). But this record merely shows one more impermissible, unconstitutional application of § 12.31(b) in a trial conducted before the Supreme Court decided *Adams v. Texas*. Because the teachings of *Adams* continue to be either lost on or

ignored by a majority of the Court, I am constrained to respectfully dissent.

TEAGUE, J., joins.

## APPENDIX

After greeting Patricia Freeman and introducing counsel, the trial judge explained abstractly the State's burden to prove the allegations in the indictment and the answers "to the ... two or three questions we call special issues [that the trial court will propound to the jury at the punishment phase of the trial]," and the jury's corresponding duties in those regards. Then, after explaining the effect of the answers to the abstract questions to be propounded at punishment, the trial judge asked Freeman whether she had any "religious, moral or conscientious scruples or scruples of any sort of that matter against the infliction of death as a punishment for crime in a proper case?"

Freeman stated she held "conscientious" scruples. She further indicated, "I just don't know" when asked if she could participate in a verdict under "the most awful fact situation that you can possibly think of." The trial judge insisted, "I have to push you for a yes or no answer."

Freeman inquired, "You mean could I ever give anybody the death penalty?" The trial judge confirmed her meaning. Freeman stated, "Yes."

The trial judge asked Freeman, essentially, if she were sure, stating, "I am not trying to change your mind." Freeman replied, "Gosh. It makes me a nervous wreck to think about it." Taking a different tack, the trial judge asked what would

---

**7.** The voir dire as a whole reveals the trial judge's commendable rejection of the all too typical abuse of § 12.31(b) which was characteristic of contemporary capital trials throughout the State. She was not content to permit wholesale exclusions of those whose "deliberations" might be "affected" by the mandatory penalties in her own court; instead, she interpreted and limited application of § 12.31(b) to those, like Freeman, who stated they would *resolve* issues "differently" because of the mandatory penalties.

While the trial judge's version of the criterion for exclusion under § 12.31(b) is closer to being constitutional than was this Court's, see, e.g., *Moore v. State*, 542 S.W.2d 664 (Tex.Cr.App. 1976), the rationale of *Adams v. Texas*, decided two years after the instant voir dire was conducted, would condemn them both, for the distinction between resolving an issue "differently" and allowing deliberations to be "affected" is far too fine.

prove to be the focus of the remainder of Freeman's voir dire examination:

"Let me ask you another way, Mrs. Freeman. Would the fact that the death penalty was a possible punishment cause you to resolve any fact issues *differently* from the way you might otherwise resolve it?"

Freeman agreed that it would, pointing out that in her role as a teacher, she "almost [goes] beyond being fair" when she knows a child might receive a certain punishment. Then the following:

"Q: [By the Court]: This is one of the times you have to look inside yourself because nobody but you can tell how you feel. * * *

A: Certainly. This is something to think about but you never face the fact that you could actually have to—yes, I guess I could. Yes, I could.

Q: You could in a proper case?

A: Thinking of the worst case I can think of, yes.

Q: If you thought it was proper?

A: Yes.

Q: And additionally then would the fact that the death penalty was a proper punishment or a possible punishment would that cause you to *resolve any fact issue any differently from the way you would resolve it if that was not a possible punishment?*

A: It shouldn't. *If there is no reasonable doubt it shouldn't.*

The court told Freeman "if there is a reasonable doubt then your oath as a juror requires you ... to find someone not guilty or to answer the [questions no]." Freeman replied,

"A: So, if I have a reasonable doubt *how would that affect me?*

Q: No.

A: That's what I'm saying right now. Yes, it would."

After reiterating her "resolve it differently" criterion, the trial judge explained to Freeman that "beyond a reasonable doubt" was the standard of proof in both capital and ordinary criminal trials and the jury's role is to resolve fact issues. She concluded:

"My question to you is the fact that the death penalty is a possible punishment would that cause you to resolve any fact issues *any differently* than from the burglary case merely because the death penalty was a possible punishment?

A: No.

Q: It would not?

A: No."

The prosecutor then began his examination of Freeman by informing her that if selected, she would be required to "take another oath ... and that would go something like this, that you will a true verdict render according to the law and the evidence so help you God. The key words are 'according to the law and the evidence.' Okay?" Using as an example a juror who is opposed to proscriptions regarding marihuana, the prosecutor was able to help Freeman understand that it would be improper "to find the person not guilty—not because of the evidence but due to ... beliefs" and told her "this is what we are trying to prevent." He then returned to the death penalty, asking Freeman about her discussions with others. She conceded that in such discussions, "I am usually against it."

Freeman told the prosecutor that "it would rest on my conscience that I have sentenced somebody to death." He assured her there was nothing wrong with her beliefs, but what was critical was that she not "let those beliefs *interfere* with her deliberations." Freeman conceded:

"I am afraid that I could let those beliefs that I have in that the idea that this could be on my mind interfere with how I feel."

The following then occurred:

"Q [By Prosecutor]: It sounds like—I am not trying to put words in your mouth but what I am getting at is that it seems those beliefs would *interfere with your deliberations?*

A: Yes, I believe they would.

Q: We need to have a positive statement. * * *

[Defense Counsel]: Judge, we object to that.

Q [By Prosecutor]: Either you feel they will or they will not.

[Defense Counsel]: We object to that. That is an improper statement under Witherspoon.

[Prosecutor]: *I am not under Witherspoon, Judge.*

THE COURT: *That's right. He is not at this moment,* [defense counsel], *under Witherspoon.*

A [By Witness]: My beliefs would interfere.

THE COURT: What he is asking you really is can you set aside your own personal beliefs and follow the law as given you by the Court *or* would your own personal beliefs cause you in your deliberations as a juror to *decide a fact issue differently* from the way you might otherwise decide it?

A: Yes they would."

Without stating the basis, the prosecutor moved to "excuse her." Defense counsel began his voir dire by telling Freeman that what the court and the prosecutor and he were asking is whether she would answer an issue "no" even if the evidence showed beyond a reasonable doubt, it should be answered "yes." The trial judge interrupted:

"Or resolve a fact issue *differently,* Mr. [Defense Counsel]."

Then an esoteric discussion took place between the attorneys and judge about the guilt stage versus the punishment stage and "fact issues" versus "three questions," which clearly confused the prospective juror.[1] But finally, defense counsel repeated his earlier inquiry about whether Freeman would answer "no" even if the evidence established it should be "yes." The juror stated (or inquired), "I didn't answer that question." And, she never would answer it. Each time it was restated the prosecutor or judge interrupted. Finally, defense counsel asked:

"Q: Would ... your personal beliefs *affect* your answer as to any fact issue in answering those questions yes or no even though the State proved up their case beyond a reasonable doubt?

A: No.

[Defense Counsel]: Judge, I submit to you she has been rehabilitated.

THE COURT: *Yes sir.* Go ahead Mr. [Prosecutor]."

When the prosecutor resumed questioning, Freeman told him she was very confused by the "terminology and the way you are speaking." She indicated she "thought" she had previously answered the same question when he, the prosecutor had asked it, "no;" but now she was wondering if it was a different question altogether. The prosecutor stated:

"No, what we are trying to get at is—

A: Could my beliefs interfere?

Q: Yes, as to either the guilty or not guilty part or to the three questions submitted to you.

THE COURT: Or any fact situation. Would you answer it differently as to a fact issue of guilty or not guilty or as to the answers to those questions. Even though the State has proved something to you beyond a reasonable doubt whether it should be an answer of guilty or an answer of yes would you do something differently merely because of your own personal objections to the assessment of death?

[Defense Counsel]: Judge—

THE COURT: Just a minute, Mr. House.

A: My conscience—I don't want it on my conscience that I have given anybody a death penalty. Therefore I believe the beliefs I have *could* change my answers.

Q: It would *affect your deliberations?*

A: *It would affect my deliberations, yes.*

THE COURT: It would cause you to resolve a fact issue *differently* from

---

1. Indeed, it confuses the writer.

the way you would otherwise resolve it?

A: Yes, it—I *might* twist it in my mind.

THE COURT: It's whether or not you would resolve it *differently*, Mrs. Freeman.

A: Yes.

THE COURT: You would? All right.

[PROSECUTOR]: We will move to excuse her, Judge."