Anthony Ray WESTLEY, Appellant,

v.

The STATE of Texas, Appellee.

No. 69497.

Court of Criminal Appeals of Texas,
En Banc.

June 15, 1988.

Floyd W. Freed, III, on appeal only, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty., and Linda A. West, John Kyles and George Lambright, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

WHITE, Judge.

Appellant was convicted of capital murder in Harris County. See V.T.C.A., Penal Code Sec. 19.02(a)(2). After the jury made affirmative findings on the three special issues set out in Art. 37.071(b), V.A.C.C.P., the trial court imposed the penalty of death. This case is before us on direct appeal.

The appellant presents us with four points of error, none of which involve alleged error during voir dire. A review of the facts is necessary.

On Friday, April 13, 1984, Debra Young was working at Eileen's Bait and Tackle on C.E. King Boulevard in northeast Houston. The store was owned and managed by Eileen Hall and her husband, Chester Frank Hall, the deceased. Mrs. Hall had opened the store at 5:30 a.m., but left when her

employee, Ms. Young, arrived. Mrs. Hall met her husband for lunch, and then returned home. Mr. Hall was going to drop in at the store after lunch. Early in the afternoon, Mrs. Hall received a frantic call from Ms. Young. Ms. Young was screaming over the line. It was difficult for Mrs. Hall to understand her. Mrs. Hall immediately called "911", and then went to the store.

Ms. Young described at trial what happened in Eileen's Bait and Tackle in the early afternoon of April 13th. Both Young and the deceased were in the store after lunch. The deceased left the store between 1:30 and 2:00 p.m. Three men then entered the store. One of the men walked up to the counter and requested some bait. At trial, Young identified the appellant as this man. She recognized one of the other two as a regular customer of the bait and tackle store. After Young prepared the bait which appellant requested, the appellant grabbed her and produced a gun. Young stated that appellant stuck the gun "in my nose ... I started screaming. He said, 'Shut up, or I will kill you'." The appellant demanded money, and then struck Young in the chest, knocking her back against the wall. He forced Young to open the cash register and ordered her to lay down behind the counter. Appellant grabbed money from the cash register. He then found a pistol case and a money bag behind the counter. Both were empty. He asked Young for the rest of the money. She told the appellant that her boss had taken it with him. The appellant then told Young to turn her face to the wall and he then put his gun to her back. The next sound Young heard was the ringing of a bell on the front door as someone entered.

The appellant rose, turned and shot towards the door. The appellant then ran out from behind the counter. On cross-examination, Young said she heard the appellant fire the first shot. She then heard a rapid succession of gunshots, from both large and small calibre pistols. Young asserted that she had a good familiarity with the use of handguns, and the different sounds of gunfire. She also claimed to be very familiar with the deceased's handgun

(she referred to it as a "sugar papa"), and the sound it made when fired. When the exchange of gunfire began, she got up to a crouching position so that she could see over the counter.

When she got up, she saw the deceased running towards the store's office with the appellant close behind him. Though the deceased still carried his handgun, Young did not see him point it again or shoot it at anyone. The appellant caught up to the deceased before he could reach the office, and the two men began to struggle.

Young watched the appellant repeatedly hit the head of the deceased into a concrete fish tank. At about that time, Young testified, she heard four or five more gunshots, none of which sounded like the deceased's handgun. She saw both men jerk. Then the appellant ran out of the store followed by one of his accomplices, who appeared to be wounded. When they were gone, the deceased rose to his feet, took a few steps toward Ms. Young and stopped. Blood began to flow from his mouth and he collapsed. After coming out from behind the counter, she saw where the third robber lay, dying on the floor of the bait and tackle shop. On the next day, April 14, Ms. Young positively identified the appellant at a line-up.

Gordon Adams operated a business next door to the bait and tackle shop. He testified that on April 13, he was working in his shop when several loud noises got his attention. He watched two men run out of the bait store. The man who got in the passenger side was doubled over, and the driver took off before the passenger had gotten his door closed. Though Adams could not identify either man at trial, he was able to positively identify two photographs, State's Exhibits 18 and 19, of the getaway car.

Kenneth May was driving by the store at the time of the shooting. He saw two men run from the bait shop, get into a blue Buick and speed out of the parking lot, nearly colliding with his own car. May pursued the Buick for five or six miles at high rates of speed. He gave up his pur-

suit when the Buick ran a red light. May could not identify either of the occupants of the car. However, he did identify State's Exhibits 18 and 19 as being photographs of the Buick which he pursued on April 13th.

Ricky Foreman was employed as a security guard at Northeast Memorial Hospital. Foreman testified that the appellant brought a friend into the emergency room at approximately 2:00 p.m. on April 13th. The friend was suffering from a gunshot wound. Foreman positively identified State's Exhibits 18 and 19 as photos of the automobile driven by appellant. Foreman also positively identified appellant as the driver.

Thelma White was employed as a registered nurse and as the director of the emergency room at Northeast. She stated that at approximately 2:00 p.m. a large man carried in a gunshot victim. She paid little attention to the large man in order to care for the gunshot victim. She identified the gunshot victim at trial as John Dale Henry. She could not identify appellant at trial, but did recall that the large man was very abusive.

Officers from the Harris County Sheriff's Office arrived at the bait store shortly after the shooting occurred. Detective Earl Bockel supervised the crime scene investigation, interviewed the available witnesses, and participated in the interrogation of the appellant. There were no latent fingerprints recovered at the bait and tackle store. Debra Young found some lead fragments at the scene, which appeared to be bullet fragments. Two guns were found at the scene. Bockel stated that the guns used by appellant and John Dale Henry were not found. A .25 calibre automatic was found beside the corpse of the third robber, Walter Dunbar. A five shot derringer (the "sugar papa") was found near the victim. A firearms examiner for the Houston Police Department, C.F. Anderson, testified that the bullet recovered from the body of the deceased could not be traced to either Dunbar's automatic or the deceased's derringer.

Lieutenant Joe Seckler was given the job of locating the car which was seen by the witnesses. He found it a few miles from the residence of Walter Dunbar. Detective Watson R. Davis processed the vehicle. Detective Davis found two rolls of pennies, State's Exhibits 21 and 21–A, beneath the armrest of the front seat. After securing the vehicle, Davis turned it over to Deputy Sherri Grounds. Grounds photographed the vehicle and searched for fingerprints. She explained that none of the latent prints could be matched up with the appellant. She identified State's Exhibits 18 and 19 as photographs which she took of the vehicle found by Seckler.

Dr. Vladimar Parungao, the Assistant Medical Examiner of Harris County, performed the autopsy of the deceased, and recovered bullets from the body. Parungao was able to determine that death resulted from one of the gunshot wounds. He described the entrance wound of the fatal shot as being surrounded by soot and powder stippling about ¼ inch in diameter. In the opinion of Parungao, the tip of the murder weapon had to be within six inches of the deceased's body when the fatal shot was fired. Parungao also described the path of this bullet through the deceased. It entered the victim's back six inches to the left of the midline and sixteen inches from the top of the head. Its' path ran from back to front, to the right and downward.

Firearm's Examiner C.F. Anderson also testified at trial. He could not trace the bullets recovered from the body of the deceased to either of the handguns found at the scene. However, he did identify State's Exhibit No. 17 as a photograph of a long barrel Ruger .22 calibre. Anderson stated that gun could fire both .22 calibre long rifle bullets and .22 calibre shorts. Anderson identified the fatal bullet recovered by Parungao as a .22 calibre long rifle bullet. When Debra Young was testifying, she identified State's Exhibit 17 and described it as follows, "It appeared to be the gun that Westley used on me."

The State admitted more testimony to support its allegation that appellant carried

the murder weapon and shot the deceased. Bertha Cousan and Crischilla Cousan lived in the residence where the appellant and his accomplices planned the robbery of the bait and tackle store. Bertha Cousan testified that on April 13, 1984, she overheard the appellant, John Dale Henry, and Walter Dunbar discussing a robbery. Bertha saw the appellant go to his room and come out with a dark, long-barreled pistol, which he stuck down his pants. Bertha testified this pistol looked like the one portrayed in State's Exhibit 17. Bertha also testified that when the appellant returned to the residence, "He said that he had wasted this white man, and my brother had got shot and he took him to the doctor, and he said that Tyrone (her reference to Walter Dunbar) was already dead." Crischilla Cousan testified that she also saw a gun, similar to the one displayed in State's Exhibit 17, in the possession of the appellant on the morning of April 13, 1984.

After the jury convicted the appellant of capital murder, the sentencing phase of his trial began. The State introduced evidence of two similar extraneous offenses. On May 29, 1982, the appellant robbed Jose Sanchez of Sanchez's Jewelry Store in Houston. At this robbery the appellant pulled a gun and threatened Sanchez. A struggle ensued, and the appellant shot Sanchez in the chest. Sanchez testified that he spent twenty-nine days in the hospital, recovering from his wound.

On April 3, 1984, the appellant and one accomplice robbed Loverous Whittaker, Rayford Stripling, and Cornell Vaughn at the real estate office where they worked. All three victims identified the appellant as one of the two robbers. All three testified that appellant used a large, black pistol during the course of the robberies. Both Whittaker and Stripling said the pistol was similar to the one described by Debra Young.

The appellant called five witnesses to testify that appellant was a fun person and that he had a good reputation for being peaceful and law-abiding. The State asked each witness if they had heard of the appellant's prior felony convictions. None of the five witnesses said they had heard of these convictions.

We affirm the conviction.

██ In his first point of error the appellant argues the trial court erroneously admitted the appellant's written confession. The appellant claims that his confession was not given voluntarily because he was illiterate and could not understand what was written. He also claims involuntariness because he was denied the assistance of counsel. He asserts that the State failed to prove otherwise during the trial court's hearing on the voluntariness of his confession.

In the instant case, the appellant states the waiver of his right to the assistance of counsel was not proven to be an intentional relinquishment of that right. The appellant explains that his waiver was not voluntary because of his inability to read and write. The appellant states that his illiteracy[1] was indicative of his low level of intellect and educational experience. The appellant asserts that these factors prove he did not have the ability to comprehend the warnings read to him by the officers. The appellant claims that if the police officers had taken him before a magistrate for his warnings,[2] the magistrate would have made a good faith inquiry into whether appellant fully understood his rights. The implication is that the officers who warned him, in compliance with Art. 38.22, Sec. 2(a), did not act in good faith to determine the appellant's understanding of his rights, including his right to the assistance of counsel. According to the appellant, this establishes that the State failed to prove that he voluntarily confessed to the murder of Frank Hall.

Initially, we note that there is no requirement that a defendant must receive his warnings from a magistrate. Art. 38.22, supra, requires only that the face of a

---

1. Appellant could sign his name and initials, but, in his own words, he "never tried to learn nothing else."

2. The appellant refers to the warnings set out in Art. 15.17(a), V.A.C.C.P.

statement executed by an accused show that, prior to making the statement, he received the warnings from a magistrate *or from the person to whom the statement is made*. In *Penry v. State*, 691 S.W.2d 636 (Tex.Cr.App.1985), cert. denied, 474 U.S. 1073, 106 S.Ct. 834, 88 L.Ed.2d 805 (1986), this Court stated,

"Under the provisions of Art. 38.22, supra, the face of the statement must show that the accused received the magistrate's warning or the proper warning from the person who took the statement. Since we have held that the printed warning on the confession received from the officer who took the statement was adequate under Art. 38.22, supra, the question of whether the recitation of the magistrate's warning was adequate is rendered irrelevant." *Penry*, at 643.

We will review the record of the hearing on the voluntariness of the confession to determine if the person who took the appellant's statement properly warned the appellant first. From this we can decide if the trial court's finding, that the statement was given voluntarily, was supported by the evidence.

At a hearing on the voluntariness of a confession, the trial court is the sole judge of the credibility of the witness. *Paster v. State*, 701 S.W.2d 843 (Tex.Cr.App.1985). In *Lamb v. State*, 680 S.W.2d 11 (Tex.Cr. App., 1984), this Court held, "The judge at the *Jackson v. Denno* hearing is the sole judge of the weight and credibility of the witnesses. He may believe or disbelieve all or any part of any witness' testimony."

The appellant testified at the *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964) hearing. The appellant explained that no one read him his rights prior to the taking of his statement. When his attorney listed the warnings for him, the appellant claimed not to recognize them. The appellant recounted an alleged conversation between himself and Detective Ronald Philips, wherein the appellant requested a lawyer and Philips told him that under a new law the appellant didn't need a lawyer. On cross-examination, the appellant admitted that when he was previously convicted for burglary, his rights had been explained to him. The appellant also acknowledged that his rights were read to him before he signed his confession.

The officers who testified at the hearing provided a different account of what happened. The appellant surrendered himself at the Sheriff's Office at 9:50 a.m. on April 14th. Detectives Bockel and Philips testified that appellant never told them he wanted a lawyer when he arrived. They also testified that they read the "blue card" warnings to the appellant when he arrived, and he stated that he understood them. Philips and Bockel both denied ever telling the appellant that he did not need a lawyer.

Soncedra Pratt also testified at the hearing. Pratt is a civilian employee of the Sheriff's Office who assisted in taking the appellant's statement. She said that she typed the appellant's statement, "sentence by sentence like he said it." When she read it back to him, the appellant did not request any corrections in the wording, and said he understood what had been typed. Pratt also saw the appellant individually initial the warnings. Pratt heard the appellant say he understood the warnings and his statement before he signed it.

Bockel and Philips supported the testimony of Pratt that appellant indicated that he understood the warnings before he signed his statement. Philips also pointed out that the appellant indicated that he understood the phrase "terminate the interview."

The trial court made these findings:

THE COURT: The Court will overrule your motion based on Article 38.22 of the Texas Code of Criminal Procedure. The Court finds that all the requirements in Section 2 have been complied with, in that the magistrate warning as required by Section 15.17, Article 38.22, Section 2(a) says that one of the prerequisites of using a statement, that prior to making the statement that the accused receive from a magistrate the warnings provided in Article 15.17 of this code, or receive from the person to whom the statement is made, the warnings that were given.

The Court finds that Detective Bockel read the statutory warnings required by

the code prior to the taking of the statement, and that further warnings were read to Mr. Westley prior to his signing the statement, and that Mr. Westley did not indicate that he did not understand any of them and continued to cooperate, freely and voluntarily waiving those rights and voluntarily making the statement.

The Court will further find the statement was not coerced, taken as a result of force, threats, or coercion against Mr. Westley.

Therefore, as a matter of law, it can be admitted with the instructions to the jury.

It is obvious the trial court chose to believe the testimony of Pratt, Bockel and Philips. We have reviewed the testimony of the state's witnesses and the appellant and we find that the trial judge had ample testimony upon which to base his factual findings. *Paster, supra;* and *Lamb, supra.*

We note that appellant also asserted that his illiteracy effectively served as a bar to his ability to understand either the warnings, or the statement, read to him. This Court has held that, "there was and is no requirement that a person be literate before his confession can be admissible." *Pete v. State,* 501 S.W.2d 683 (Tex.Cr.App. 1973). The state's evidence indicated that appellant's illiteracy did not prevent him from understanding what was read to him.

Lastly, appellant relies on *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), as authority for his claim that the denial of his request for counsel rendered his confession involuntary. In *Brewer,* the defendant claimed that his right to the assistance of counsel was violated. The police were aware of the defendant's contacts with an attorney before, and after, his arraignment on a charge of murder. While the defendant was being taken back to the city where he allegedly committed the murder, and after the defendant told the officers escorting him that he would explain everything after he saw his attorney in person, one of the escorting officers gave the defendant the "Christian burial" speech. The defendant then led the officers to the location of the victim's corpse, ostensibly in order for her family to give her a "Christian burial." The Supreme Court held that, "it was incumbent upon the State to prove an intentional relinquishment or abandonment of a known right or privilege." *Brewer, supra.*

We find *Brewer* to be distinguishable. In the instant case, the evidence showed that appellant was not denied a request for the assistance of counsel. The evidence shows, instead, that appellant understood that right when it was read to him, and voluntarily waived that right before he confessed.

Point of error one is overruled.

■ In his second point of error, the appellant states the evidence was insufficient to support an affirmative answer to special issue no. 1, submitted pursuant to Article 37.071, V.A.C.C.P. We must review the evidence in the light most favorable to the verdict, in order to determine if any rational trier of fact could find, beyond a reasonable doubt, that the appellant committed the act "deliberately and with the reasonable expectation that death would result." *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Sutherlin v. State,* 682 S.W.2d 546 (Tex.Cr. App.1984); *DeGarmo v. State,* 691 S.W.2d 657 (Tex.Cr.App.1985); and *Lane v. State,* 743 S.W.2d 617 (Tex.Cr.App.1987).

Appellant did not testify at either stage of his trial. His confession was admitted into evidence. In that confession, the appellant described his role and actions during the robbery. This account radically differed from the story told by Debra Young. The appellant admitted that he took a large .22 calibre pistol ("it looked like a cowboy's gun") with him on the robbery. But he stated that it was one of his co-defendants who confronted Young, demanded money and shoved her around. According to the appellant, when the victim entered the store, his two co-defendants opened fire at the victim. The appellant admitted that he fired a shot, but only as he was escaping through the front door.

Other evidence at trial indicates a significantly different series of events. Appellant planned the robbery with his co-defendants, arming himself with the .22. Appellant led the three robbers at the bait and tackle store. He confronted Young, robbed her, shoved her around and struck her. Appellant then made Young lie down before he placed his gun at her back. Young believed, at this point, that appellant would have shot her if the victim had not walked in. After the first exchange of gunfire, the victim attempted to run away from the appellant into the office. The appellant pursued the victim and caught him near the fish tank. Neither of the other robbers was near the appellant and the victim. Young heard shots and saw the victim's body jerk. The state's expert said the victim died from being shot in the back at extremely close range, most likely with a gun very similar to the one seen in the appellant's possession. The appellant then fled the scene.

We find, from these facts, that the evidence supports an inference that the appellant's conduct was committed deliberately and with a reasonable expectation that the death of the victim would be the result. This is evident from the appellant's decision to pursue the victim through the store, in order to shoot at him again from closer range. Perhaps a lack of deliberation would have been evident if the appellant had fled from the store after the initial round of gunfire. But the testimony of Young showed the appellant chose a different course of action. We find the evidence was sufficient to support the jury's affirmative finding to special issue number one. *Green v. State*, 682 S.W.2d 271 (Tex.Cr. App.1984), cert. denied, 470 U.S. 1034, 105 S.Ct. 1407, 84 L.Ed.2d 794 (1985); *Williams v. State*, 674 S.W.2d 315 (Tex.Cr. App.1984). The second point of error is overruled.

■ In point of error three, the appellant asserts that the evidence at trial was insufficient to support an affirmative finding to special issue number 3, submitted pursuant to Art. 37.071, V.A.C.C.P. The appellant summarized the evidence at trial as follows:

"In evaluating the conduct of the defendant, if the defendant's statement is true, he fired one non-fatal shot, or, if the statement of Mrs. Young is true, the defendant's gun discharged during his physical struggle with Chester Frank Hall. In either event, the sufficiency of the evidence is inadequate to support an affirmative response to special issue number three."

The appellant asserts this evidence does not establish that his conduct in killing the victim was unreasonable in response to the provocation of the victim, Hall. The appellant cites *Green v. State, supra,* in support of this point of error.

Not only do we find the appellant's version of the facts to be somewhat skewed, we also find that the authority upon which he relies does not support his argument.

The facts of the instant case show that there were two separate periods of gunfire in the bait and tackle store on April 13. The first occurred when the victim walked in on the robbery of his wife's employee. In order to prevent the crime and protect Young, he began to shoot at the three robbers, killing one and wounding another. The victim then attempted to evade the appellant who was unhurt in the exchange of gunfire. But the appellant caught the victim before he got to his office, subdued him by slamming his head against the fish tank, and shot him in the back.

Initially we note that a robber has no right of self-defense against his victim. This is especially true when the victim is justified in acting to recover his property, prevent the offense or save another person. *Davis v. State*, 597 S.W.2d 358 (Tex.Cr. App.1980). It would be ludicrous to consider the victim's justified actions as provocation for the appellant's illegal act.

*Green, supra* and *Smith v. State*, 676 S.W.2d 379 (Tex.Cr.App.1984), both present similar fact situations to the instant case. In *Green*, the victim struggled with the defendant during a burglary of his home. The evidence showed the defendant first shot the victim during the struggle. He

then dragged the victim into the kitchen where he shot him again. This Court concluded that the defendant's actions were unreasonable, especially in light of the passage of time between the first shot and the execution of the victim. In the instant case, there was a similar passage of time between the exchange of gunfire and the appellant's shooting the victim in the back.

In *Smith, supra* this Court recounted what occurred when the victim walked in on a robbery by the defendant:

"About this time, Roy A. Deputter, the deceased, entered the store via the back door. Hamilton told him to move to the front of the store. Hamilton's attention was diverted momentarily when a male customer entered the front door. When he turned back, Deputter was holding a pistol on him. Hamilton ducked just as Deputter fired at him. Hollis, meanwhile, ducked behind some display cases, still holding the bag of money. Hamilton heard two more shots, then saw Deputter stagger toward the front of the store, apparently wounded. Deputter fired again just as he slumped to the floor. The shot went wild." *Smith, supra* at 383.

The facts in *Smith* are also similar to the facts of the instant case.

In *Smith*, this Court stated,

"Appellant urges that however otherwise culpable he may be the deceased's own 'foolhardy' attempt to foil the robbery precludes appellant's receiving the death penalty. ... He contends the evidence of provocation by the deceased was so overwhelming the jury could not properly have answered 'yes' to special issue number three submitted under Article 37.071, supra. He argues that the deceased's firing at Hamilton and also wounding him was a mitigating factor that cannot be ignored. In viewing the evidence in the light most favorable to the jury's answer, we find it sufficient to support the affirmative answer to special issue number three." [footnote omitted] *Smith, supra* at 393–394.

3. See points of error two and three.

As this Court did in *Green* and *Smith*, we find, after viewing the evidence in the light most favorable to the verdict, that a rational trier of fact would be warranted in finding beyond a reasonable doubt that special issue three be answered affirmatively. Point of error three is overruled.

■ The appellant sets out point of error four as follows:

"The appellant should be entitled to the benefit of this Court's holding in *Green v. State*, 682 S.W.2d 271 (Tex.Cr. App.1984)[3] that the jury cannot apply the law of parties in answering the three special issues submitted during the punishment phase of the trial pursuant to Art. 37.071, V.A.C.C.P."

In the instant case, the trial court failed to instruct the jury not to consider the law of parties during the punishment phase of the trial. See *Green, supra*, note 4, at 287. The State did not argue for the application of the law of parties in answering the three special issues at punishment. Instead, the State argued that appellant should be judged as the principal actor in determining his punishment.

The appellant claims that he requested a special punishment instruction be included in the trial court's charge. He states this instruction would have told the jury not to consider the law of parties in answering the three special issues. However, we find the record before us reflects otherwise.

From studying all of the record, we have assembled the following chronology of events:

5-10-'85 The jury spends 35 minutes deciding the appellant is guilty of capital murder (from the trial court's docket sheet)

5-14-'85; 11:10 a.m. The hearing on punishment concluded and the trial court recessed for lunch and preparation of the charge (trial court's docket sheet). The counsel for appellant then made the following objection to the punishment charge. This was the only objection made, or referred to, in open court:

"I have an objection, your Honor. My objection is that I object to the charge in that it does not include instructions to the jury that they should consider each special issue individually and independently of each other. It is my concern, Your Honor, that the jury, without that instruction, would tend to lump all 3 special issues together and perhaps decide the answer to one special issue predicated upon the answer to another special issue. Therefore, I would object to this charge in that it does not include that instruction or does not include an instruction to the jury that they should consider each special issue individually and independently of each other."

The trial court denied the request.

1:55 p.m. The trial court's instructions on punishment are read to the jury. (Clerk's file mark on document; verified by trial court's docket sheet).

2:03–3:55 p.m. Arguments on punishment are heard by the jury. (Trial court's docket sheet).

4:34 p.m. Jury sends out a note during their deliberations. The note requests that all of the exhibits be sent in to them. (Clerk's file mark on the document).

7:05 p.m. Jury returns verdict on the three special issues. (Clerk's file mark on the document; verified by the trial court's docket sheet).

7:20 p.m. The attorney for the appellant submits a handwritten request for a *Green* instruction. (Clerk's file mark on the document).

We find that the appellant failed to object to the exclusion of a *Green* instruction from the charge. His request for a special instruction was not timely, and failed to alert the trial court to the defect in the charge. The failure to object to the error

waives all but fundamental error. Art. 36.-19, V.A.C.C.P.; *Duffy v. State,* 567 S.W.2d 197, 204 (Tex.Cr.App.1978) cert. denied, 439 U.S. 991, 99 S.Ct. 593, 58 L.Ed.2d 666 (1978); and *Nichols v. State,* 754 S.W.2d 185 (Tex.Cr.App., 1988), pet. cert. pending. The error, to constitute fundamental proportion, must be egregious and create such harm that it deprives appellant a fair and impartial trial. Art. 36.19, *supra; Almanza v. State,* 686 S.W.2d 157, 171–172 (Tex. Cr.App.1985). We find no such error or harm in the instant case.

This Court has recently held that the failure of a trial court to sua sponte charge the jury that the law of parties may not be applied to the punishment special issues does not constitute fundamental error. *Nichols, supra.* "That instruction is not required by *Green, supra,* or *Enmund* [*v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) ], *supra,* nor is it mandated by any Texas statute. ... While it is abundantly clear that an 'anti-parties' charge would be acceptable and, in fact, applauded by this Court, ... the failure to give such a charge, absent a request or objection, does not constitute fundamental error.," *Nichols, supra.*

In the instant case, we find the appellant was not egregiously harmed by the absence of the charge. As in *Nichols,* the jury was instructed on the law of parties during the guilt-innocence phase of the trial. We cannot presume they considered that instruction while deliberating on punishment. The special issues at punishment incorporate the requirements of *Enmund* and *Green* by focusing the jury's attention solely upon the culpability of the appellant. *Cuevas v. State,* 742 S.W.2d 331 (Tex.Cr. App.1987); *Nichols, supra.* [4]

---

**4.** In Special Issue Number One, the trial court asked the jury,

"Was the conduct of the defendant, Anthony Ray Westley, that caused the death of the deceased committed deliberately and with the reasonable expectation that the death of the deceased would result?"

In Special Issue Number Two, the trial court asked the jury,

"Is there a probability that the defendant, Anthony Ray Westley, would commit criminal acts of violence that would constitute a continuing threat to society?"

In Special Issue Number Three, the trial court asked the jury,

"Was the conduct of the defendant, Anthony Ray Westley, in killing the deceased unreasonable in response to the provocation, if any, by the deceased?"

As in *Nichols,* the evidence at the appellant's trial showed that appellant's conduct was directly responsible for the death of the victim. As we held in point of error two, the evidence was sufficient for a rational trier of fact to have found beyond a reasonable doubt that appellant deliberately caused the death of the victim, with the reasonable expectation that the victim's death would be the result. In point of error three, we decided the evidence was sufficient for a rational trier of fact to find that appellant's conduct in killing the victim was an unreasonable response to the provocation, if any, of the victim. Because the appellant's actions, alone, justified the jury's affirmative answers to the punishment special issues, we find he did not suffer egregious harm from the absence of the *Green* instruction from the punishment charge. Point of error four is overruled.

The judgment is affirmed.