

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| RICARDO LORENZO MACIAS, JR., | § | No. 08-17-00144-CR |
| Appellant, | § | Appeal from |
| v. | § | 120th District Court |
| THE STATE OF TEXAS, | § | of El Paso County, Texas |
| Appellee. | § | (TC # 20130D03635) |
| | § | |

**O P I N I O N**

A jury found Appellant Ricardo Lorenzo Macias guilty of one count each of manslaughter and aggravated robbery with the use of a deadly weapon. The jury sentenced him to 10 years of community supervision on the manslaughter conviction and 22 years in prison on the aggravated robbery conviction. On appeal, Appellant challenges only his aggravated robbery conviction, raising three issues relating to the jury charge. In his first two interrelated issues, Appellant argues that the trial court erred by failing to instruct the jury that his theories of self-defense and the defense of others could be applied to the aggravated robbery charge, and that this failure constituted egregious error requiring reversal of his conviction despite his failure to request such an instruction at trial. In his third issue, Appellant argues that the trial court erred by instructing the jury that his "arm" could be considered a deadly weapon for purposes of finding him guilty of

aggravated robbery with the use of a deadly weapon.

Finding no error in the jury charge, we affirm.

## FACTUAL BACKGROUND

The body of Jose Andres Castanon, a known drug dealer, was found in his home by one of his customers at approximately 2:00 p.m. on May 17, 2013, after she became concerned when Castanon did not answer her phone calls. The customer found Castanon's body on the floor of his home with a pair of jeans wrapped around his neck; she further observed that Castanon had bruises on his body and a large cut on his head, and observed the remnants of a broken cookie jar on the floor nearby. She thereafter called 911 for assistance.

### Appellant's Recorded Interview with Police

Based on a lead they received, the police interviewed Appellant at the police station on May 18, 2013 at 2:20 a.m. After being read his *Miranda* rights and agreeing to waive those rights, Appellant provided a videotaped interview, which was admitted into evidence at his trial. ) In his interview, Appellant admitted that after an evening of drinking at a local club, he and two friends, Brianna Garay and Sonia Bautista, all three of whom were acquainted with Castanon, agreed to contact Castanon in the early morning hours of May 17, 2013 to purchase ecstasy pills from him. Garay used Appellant's cell phone to Castanon, who was initially reluctant to sell them pills at that hour, but Castanon eventually agreed to sell them eight pills for $80.00, but only if Garay came to his house alone.[1]

Garay initially went into Castanon's house alone, but at Garay's request, Appellant waited by the door to ensure her safety. Appellant recalled that Bautista waited outside in the car, in part

---

[1] The text messages, which were received into evidence at Appellant's trial, confirmed Appellant's description of Garay's communications with Castanon.

2

because Castanon and Bautista had previously expressed animosity toward each other due to a prior drug deal gone awry.

According to Appellant, after Garay went inside the house, she became involved in a fight with Castanon because she was ten dollars short on the purchase price for the pills. Garay then called out to Appellant for help, and when Appellant went inside, he observed Castanon "grabbing" Garay and calling her names. Appellant claimed that he came to Garay's defense, and that he and Castanon began fighting and wrestling with each other. Appellant recalled that while he was wrestling with Castanon, Garay called out for help to Bautista, who later entered the house and joined in the fray.

Appellant acknowledged that during their fight, he hit Castanon two or three times, and stated that when Castanon began biting his finger, he placed Castanon in a chokehold, indicating through the use of gestures that he had used his arms to do so. Appellant initially told police that Castanon had stopped moving while Appellant had him in the chokehold. However, later in the interview, Appellant stated that Castanon was still struggling when Bautista entered the house, and that Bautista began punching Castanon and stomping on his head, while Appellant continued to hold him down. Appellant claimed that he tried to stop Bautista from continuing her assault on Castanon, but Bautista tried to stab Castanon with a kitchen knife, and later hit him over the head with a cookie jar. According to Appellant's second version of the events, this is when Castanon finally stopped moving. When asked by police how the jeans became wrapped around Castanon's neck, Appellant responded that Bautista had placed them over Castanon's head because she did not want Castanon looking at her while she was hitting him.

Appellant claimed that while Bautista was still on top of Castanon, he and Garay searched

3

Castanon's home for money and drugs, and found 40 to 50 ecstasy pills, which they took with them.[2]   According to Appellant, all three of them left the house without knowing that Castanon had died, and they did not find out until the next day that he had passed away.

## The Autopsy

A subsequent autopsy on Castanon's body revealed that he died from asphyxia resulting from a lack of oxygen due to the compression of his neck, and that the manner of his death was homicide.   Although the medical examiner could not determine what object was used to compress Castanon's neck, he believed that either a chokehold or having the jeans wrapped around his neck could have caused the asphyxia.   The medical examiner also reported that Castanon had significant internal injuries to his neck, including a fracture, and that the perpetrator had used considerable force to cause those injuries.

## The Indictment

Appellant was indicted on one count each of murder and aggravated robbery with the use of a deadly weapon.   In the indictment, the State alleged that Appellant had caused Castanon's death by compressing his neck, by using either his arm or the jeans.   Similarly, the indictment alleged that Appellant had committed aggravated robbery by causing serious bodily injury to Castanon in the course of committing a theft, again by either using his arm or the jeans to compress Castanon's neck.   In addition, the indictment alleged that Appellant exhibited or used a "deadly weapon" during the commission of the aggravated robbery, to-wit, either his "arm or jeans."

## Appellant's Claims of Self-Defense and the Defense of Others

At trial, the State argued that Appellant, Garay and Bautista had entered Castanon's house

---

[2]  A witness testified that Appellant sold her two ecstasy pills at approximately 11:30 pm on the same day of Castanon's death, and that she saw Appellant holding a baggie with several pills in it at that time.

4

with the intent to rob him, contending that Garay had lied in her texts to Castanon about having the money to purchase the ecstasy pills, and that Castanon was murdered during the course of the robbery. Appellant, however, claimed that the three of them went to Castanon's house after a night of drinking and dancing solely to purchase the ecstasy pills, with no pre-existing intent to rob Castanon. Appellant further claimed that Castanon was the aggressor in the situation, asserting that Castanon was trying to rob Garay of the $70.00 she had given him for the pills, and that Castanon was assaulting Garay when Appellant entered the house.[3] Appellant claimed that he initially fought with Castanon in order defend Garay, but that he later needed to defend himself after he was unsuccessful in attempting to stop the fight.

### The Jury Charge

At Appellant's request, the trial court instructed the jury on four lesser included offenses, including manslaughter, criminally negligent homicide, aggravated assault, and simple assault. The trial court also provided the jury with general instructions on the definitions of self-defense and the defense of others, as well as specific instructions on how those two theories applied to the murder charge and to the four lesser included offenses. In particular, the trial court instructed the jury in the application portion of the jury charge that it should acquit Appellant of Castanon's murder and of the four lesser included offenses if it found that Appellant reasonably believed his use of force against Castanon was necessary to protect himself and/or Garay. The trial court, however, did not provide the jury with an instruction on how those two defensive theories applied to the aggravated robbery charge, nor did Appellant request such an instruction.

In addition, the trial court instructed the jury, without objection, that it should find

_____

[3] At trial, Appellant claimed that Castanon had a motive to rob Garay, as he was in dire financial straits and was receiving death threats due to a debt that he owed to another drug dealer.

5

Appellant guilty of aggravated robbery, as alleged in the indictment, if it found beyond a reasonable doubt that while in the course of committing a theft, Appellant "intentionally or knowingly or recklessly cause[d] serious bodily injury to Jose Castanon by compressing Jose Castanon's neck with [Appellant's] arm or jeans . . . [and that Appellant] used or exhibited a deadly weapon, to wit: [Appellant's] arm or jeans, during the commission of or immediate flight from said offense."

The jury acquitted Appellant of the murder charge but found him guilty of the lesser included offense of manslaughter, and returned a general verdict finding him guilty of aggravated robbery with the use of a deadly weapon, as alleged in the indictment. This appeal followed.

## DISCUSSION

In three issues, Appellant challenges the jury charge with respect to his aggravated robbery conviction, asserting that the trial court erred not applying his theories of self-defense and the defense of others to his aggravated robbery charge, and by instructing the jury that his "arm" could be considered a "deadly weapon."

### *Standard of Review*

When analyzing a jury charge issue on appeal, we utilize a two-pronged test. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex.Crim.App. 2005); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim.App. 1984). The first prong requires us to determine whether error exists. *See Ngo*, 175 S.W.3d at 743. If no error is found, then the analysis ends; however, if charge error is found, the error is analyzed for harm. *See Almanza*, 686 S.W.2d at 171.

The amount of harm necessary to warrant a reversal depends on whether the appellant objected to the jury charge, and thereby preserved the error. *Ngo*, 175 S.W.3d at 743; *Almanza*,

6

686 S.W.2d at 171; *see also Neal v. State*, 256 S.W.3d 264, 278 (Tex.Crim.App. 2008). If the error was preserved by a timely objection, we review the record to determine if the error caused the defendant "some harm." *Ngo*, 175 S.W.3d at 743; *Almanza*, 686 S.W.2d at 171. However, if no objection was lodged, we review the unpreserved jury-charge error for egregious harm. *Almanza*, 686 S.W.2d at 171. Egregious harm is actual, rather than theoretical harm, and must be of such a nature that it deprived the appellant of a fair and impartial trial or otherwise vitally affected the appellant's defensive theory at trial. *See Villarreal v. State*, 453 S.W.3d 429, 433 (Tex.Crim.App. 2015); *Cosio v. State*, 353 S.W.3d 766, 777 (Tex.Crim.App. 2011). In making an egregious harm determination, we examine (i) the entire charge; (ii) the state of the evidence, including contested issues and the weight of the evidence; (iii) arguments of counsel; and (iv) any other relevant information revealed by the record of the trial as a whole. *See Allen v. State*, 253 S.W.3d 260, 264 (Tex.Crim.App. 2008).

### ISSUES ONE AND TWO: SELF-DEFENSE AND THE DEFENSE OF OTHERS

In issues one and two, Appellant contends that the jury charge was defective because it failed to include an application paragraph instructing the jury that his theories of self-defense and the defense of others could be applied to the aggravated robbery charge, and that this failure constituted egregious error requiring reversal of his conviction despite his admitted failure to request such an instruction at trial. For the reasons set forth below, we disagree.

#### *The Doctrine of Invited Error*

As a preliminary matter, we find it significant that Appellant not only failed to request the application paragraph about which he now complains, but affirmatively advised the trial court during the jury charge conference that he did not want the trial court to include that paragraph in

the jury charge.

During the charge conference, the trial court initially agreed to Appellant's request to provide the jury with general instructions on the law of self-defense and the defense of others. The trial court then stated that the self-defense application paragraph would only apply to the "assaultive offense[s]," i.e., the murder charge and the lesser included offenses, and not to the aggravated robbery charge. In response, Appellant's attorney agreed, and expressly stated that he only wanted the application paragraphs included with respect to those offenses.[4]

We note that trial counsel's agreement to omit the application paragraph from the aggravated robbery charge could be interpreted as "invited error," which would bar us from reviewing his argument on appeal. *See, e.g., Prystash v. State,* 3 S.W.3d 522, 530-32 (Tex.Crim.App. 1999)(recognizing that a defendant is not entitled to complain on appeal about a trial court's submission of a jury instruction that he requested and/or to complain about the deletion of a jury instruction that he requested); *Willeford v. State*, 72 S.W.3d 820, 823-24 (Tex.App--Fort Worth 2002, pet. ref'd)(defendant invited error and was therefore barred from complaining about a jury instruction on appeal when he requested the instruction in the trial court, and even insisted that it be given over the State's objection). However, because the State has not raised the issue of invited error in its brief, and because we find no error in the jury charge, we shall proceed to resolve Appellant's argument on its merits.

### *The Law on Self-Defense and the Defense of Others*

A trial court is statutorily obligated to instruct the jury on the "law applicable to the case." TEX.CODE CRIM.PROC.ANN. art. 36.14; *Arteaga v. State*, 521 S.W.3d 329, 333-34 (Tex.Crim.App.

---

[4] Trial counsel later approved the jury charge as given to the jury, with only those application paragraphs included.

2017).  Conversely, however, if a law does not apply to a particular case, it should not be included in the jury charge.  *Arteaga*, 521 S.W.3d at 338.

The law on self-defense and the defense of others is set forth in Chapter Nine of the Texas Penal Code, which provides that a person is justified in using "force against another," including "deadly force," when the person "reasonably believes the force is immediately necessary" to protect himself or a third party from the other individual's use or attempted use of unlawful force and/or to prevent the individual from committing an enumerated offense, including the offense of robbery.  TEX.PENAL CODE ANN. §§ 9.31; 9.32, 9.33.  However, the Code also provides that a defendant's use of force against another individual is not justified if the defendant provoked the other individual's use or attempted use of unlawful force.  TEX.PENAL CODE ANN. § 9.31(b)(4)(an actor's use of force against another is not justified if, among other things, the "actor provoked the other's use or attempted use of unlawful force[.]"); *see also Westley v. State,* 754 S.W.2d 224, 230 (Tex.Crim.App. 1988)(evidence did not support defendant's claim that he acted in self-defense in murdering his victim, where the defendant initially sought to rob the victim, and the victim responded by using force against the defendant to try to prevent the crime).

Thus, when a defendant is accused of either murder or assaulting his victim, the defendant is entitled to an instruction on the law on self-defense and/or the defense of others if he presents some evidence, even if contradicted, that he reasonably believed his use of force was immediately necessary to protect himself or a third party against his victim's unprovoked use or attempted use of unlawful force.  *See, e.g., Gamino v. State*, 537 S.W.3d 507, 512 (Tex.Crim.App. 2017)(trial court erred by refusing defendant's request to instruct the jury on defendant's claim of self-defense where defendant was charged with aggravated assault and evidence supported his claim that he

9

was justified in using force against his victim). However, the same is not true when a defendant is accused of robbery. While the Penal Code allows a person to respond to another's use of force by using equivalent force to protect himself or a third party, i.e. by assaulting or even killing the other person, the Code does not allow a person to respond to another's use of force by committing a wholly unrelated offense against the person, such as by committing a robbery. Thus, as other courts have recognized, a defendant who is charged with the offense of robbery and/or aggravated robbery has no legal right to claim self-defense against his intended victim, and is therefore not entitled to receive a self-defense instruction. *See e.g., Russell v. State*, No. 05-17-00124-CR, 2018 WL 525559, at *10 (Tex.App.--Dallas Jan. 24, 2018, pet. ref'd)(not designated for publication)(defendant had no right to a jury instruction on self-defense with regard to robbery allegations in indictment); *Toliver v. State,* No. 01-87-00591-CR, 1988 WL 15126, at *1 (Tex.App.--Houston [1st Dist.] Feb. 25, 1988, pet ref'd)(not designated for publication)(defendant accused of aggravated robbery was not entitled to a self-defense instruction); *Gorman v. State,* No. 04-03-00311-CR, 2004 WL 2450875, at *1 (Tex.App.--San Antonio Nov. 3, 2004, pet. ref'd)(not designated for publication)(defendant charged with aggravated robbery with a deadly weapon had no right to receive a jury instruction on the law of self-defense).

Appellant, however, attempts to persuade us to hold otherwise by citing to the Houston Court's opinion in *Demouchette v. State*, No. 01-95-00220-CR, 1996 WL 409151, at *3 (Tex.App.--Houston [1st Dist.] July 18, 1996, pet. ref'd)(not designated for publication). In *Demouchette,* the defendant was charged with aggravated robbery and requested a self-defense instruction, which the trial court refused to give. *Demouchette*, 1996 WL 409151, at *2. In rejecting the defendant's claim that the trial court erred in refusing to give the instruction, the Court

10

held that a defendant accused of robbery is not entitled to a self-defense instruction during the guilt-innocence phase of trial "*if the only evidence presented shows the accused provoked the necessity for self-defense by attempting to rob the victim.*" [Emphasis added]. *Id*. at *3. Appellant seizes on this quoted language, asserting that the Court thereby left open the possibility that a defendant charged with robbery would be entitled to a self-defense instruction if there was at least a modicum of evidence at trial suggesting that the defendant was not the initial aggressor or provocateur. And in turn, Appellant contends that the evidence at his trial supported a finding that he was not the initial aggressor, and that instead Castanon provoked the attack by attempting to rob and assault Garay.

We do not, however, believe that the Houston Court intended to leave open the possibility that a defendant charged with robbery would ever be entitled to a self-defense instruction with respect to that particular charge. With all due respect to our sister court, we note that in the above-referenced passage in *Demouchette,* the Court was quoting from two cases in which the defendants were charged with *murder*, rather than *robbery*. *Id.* at 1996 WL 409151, at *3-4, *citing Dickson v. State,* 463 S.W.2d 20, 23 (Tex.Crim.App. 1971); *Evans v. State,* 601 S.W.2d 943, 946 (Tex.Crim.App. 1980). In both of those cases, the Court held that a murder defendant has no right to a self-defense instruction if the only evidence presented at trial demonstrated that the defendant provoked the necessity for self-defense by attempting to rob the victim. *Evans*, 601 S.W.2d at 946 (robber, accused of murdering his intended robbery victim, was not entitled to a self-defense instruction during the guilt-innocence phase of his trial, where the only evidence presented at trial showed that the defendant provoked the necessity for self-defense by attempting to rob the victim); *Dickson*, 463 S.W.2d at 23 (robber, who was accused of murdering his intended robbery victim,

11

had no right of self-defense where the only evidence demonstrated that he provoked the victim's attack on him). While a defendant charged with murder is no doubt entitled to a self-defense instruction under the appropriate circumstances, as explained above, the same simply does not hold true for a defendant charged with robbery.

Accordingly, we conclude that the trial court properly instructed the jury to apply Appellant's claims of self-defense and the defense of others only to Appellant's murder charge, but not to his aggravated robbery charge.

Appellant's Issues One and Two are overruled.

### ISSUE THREE:   THE DEADLY WEAPON FINDING

In his third and final issue, Appellant complains that the jury charge improperly gave the jury the "option" of finding that his "arm" could be considered a "deadly weapon," asserting that as a matter of law, a defendant's "body part" cannot be considered a deadly weapon.[5]   As a preliminary matter, we note that once again, Appellant did not object to this portion of the jury charge, and therefore, any error in this portion of the charge is subject to the egregious error standard set forth above.   However, because we find that no error in the jury charge, our inquiry

---

[5] As set forth above, the trial court gave the jury the "option" of finding that either Appellant's arm or the jeans found wrapped around Castanon's neck could be considered a deadly weapon.   The State expresses concern that Appellant may be attempting to argue that the trial court erred by instructing the jury in the disjunctive on this issue and/or by allowing the jury to return a general verdict.   We do, of course, recognize that the State is correct in pointing out that it is proper for a trial court to instruct the jury that it may select among alternative means by which a defendant committed an offense, and that a jury may return a general verdict without specifying which means it selected.   *See, e.g., Kitchens v. State,* 823 S.W.2d 256, 258 (Tex.Crim.App. 1991)(it is proper for jury to be charged in the disjunctive with regard to alternate theories of committing the same offense, and there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict); *Castillo v. State*, No. 08-01-00147-CR, 2004 WL 2058429, at *15 (Tex.App.--El Paso Sept. 15, 2004, pet. ref'd)(mem. op., not designated for publication) (recognizing that where alternate theories of committing the same offense are submitted to the jury in the disjunctive, the jury may return a general verdict if the evidence is sufficient to support a finding under any of the theories submitted). We do not, however, interpret Appellant's argument so broadly, and we instead believe that Appellant's argument is focused solely on the legal question of whether a defendant's arm, or other body part, may be considered a deadly weapon.

12

ends there.

### *The Law on Deadly Weapons*

The Court of Criminal Appeals first addressed the question of whether a defendant's body part could be considered a deadly weapon in *Turner v. State,* 664 S.W.2d 86, 90 (Tex.Crim.App. 1983). In deciding the issue, the Court noted that the Texas Penal Code, as it existed at that time--and as it does now--contained two separate paragraphs defining the term "deadly weapon." *Turner*, 664 S.W.2d at 88, *citing* V.T.C.A., Penal Code, § 1.07(11). The first paragraph defines the term as including "a firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury," while the second paragraph includes a catch-all definition, defining the term as "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury."[6] *Id., citing* V.T.C.A., Penal Code, § 1.07(11). In turn, the Court in *Turner* noted that "serious bodily injury" was-- as it is now--defined in the Penal Code as "bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ."[7] *Id., citing* V.T.C.A., Penal Code, § 1.07(34).

In interpreting these Penal Code provisions, the Court expressly held that although a defendant's fist or hands cannot be considered "deadly weapons" per se under the Code, a defendant's fists or hands can be considered a deadly weapon if they were used by the defendant

---

[6] The current version of the Code provides that: "Deadly weapon" means: (A) a firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury; or (B) anything that in the manner of its use or intended use is capable of causing death or serious bodily injury. TEX.PENAL CODE ANN. § 1.07(17).

[7] The current version of the Code provides that: "'Serious bodily injury'" means bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." TEX.PENAL CODE ANN. § 1.07(46).

in a manner calculated to inflict serious bodily injury; *Turner,* 664 S.W.2d at 89-90.   The Court later affirmed its holding in *Turner* in 2004, when it again held that although a defendant's body parts could not be considered deadly weapons *per se,* a defendant's hand or foot could be considered a deadly weapon depending on the manner of their use.   *See Lane v. State,* 151 S.W.3d 188, 191 (Tex.Crim.App. 2004).

Although Appellant acknowledges the holding in *Turner*, he contends that the opinion was wrongly decided, did not correctly interpret the Code, and presents an "unworkable" approach to the question of how to define a deadly weapon.   According to Appellant, the clear intent of the Code was to only allow actual "instruments" or "objects" used by a defendant during an assault to be considered a deadly weapon, and that it is illogical to consider the defendant's use of his own strength during an assault to be the equivalent of a deadly weapon.   Appellant therefore contends that we should not follow Court's holding in *Turner*, and that we should instead find that the trial court erred in instructing the jury that his arm could be considered a deadly weapon.   For the reasons set forth below, we decline to do so.

**Analysis**

First and most importantly, as the State points out, because we are an intermediate court of appeals, we are bound by the rulings of the State's higher courts, including both the Texas Court of Criminal Appeals and the Texas Supreme Court.   *See e.g., Swilley v. McCain*, 374 S.W.2d 871, 875 (Tex. 1964)("After a principle, rule or proposition of law has been squarely decided by the Supreme Court, or the highest court of the State having jurisdiction of the particular case, the decision is accepted as a binding precedent by the same court or other courts of lower rank when the very point is again presented in a subsequent suit between different parties."); *see also*

14

*Anderson v. State*, No. 08-15-00237-CR, 2016 WL 3007174, at *1 (Tex.App.--El Paso May 25, 2016, pet. ref'd)(mem. op., not designated for publication)(recognizing that we are constrained to follow the precedent clearly set by the Court of Criminal Appeals). As set forth above, the Texas Court of Criminal Appeals has made its position clear that a defendant's body part may be considered a deadly weapon when used in a manner calculated to inflict serious bodily injury, and we therefore have no authority to hold otherwise.[8]

Moreover, contrary to Appellant's argument, we find nothing "unworkable" in the approach used by *Turner*; instead, we have successfully followed and applied the holdings in *Turner* and *Lane* in numerous cases over the years, and have found that a defendant's body parts may be considered a deadly weapon when used in a manner calculated to inflict serious bodily injury. *See, e.g.*, *Rios v. State*, No. 08-06-00211-CR, 2008 WL 4351133, at *7 (Tex.App.--El Paso Sept. 24, 2008, no pet.)(not designated for publication)(evidence was sufficient to support finding that defendant used his hands as a deadly weapon, where he used his hands in a manner calculated to inflict serious bodily injury); *Milam v. State*, No. 08-04-00354-CR, 2006 WL 304528, at *6 (Tex.App--El Paso Feb. 9, 2006, pet. ref'd)(not designated for publication)(evidence was sufficient to support a finding that defendant used his hands as a deadly weapon); *Flowers v. State*, No. 08-99-00332-CR, 2001 WL 1219439, at *2 (Tex.App.--El Paso Oct. 11, 2001, no pet.)(not

---

[8] In addition, we disagree with Appellant's argument that the holding in *Turner* does not reflect the Legislature's intent with regard to the definition of a deadly weapon as set forth in the Penal Code. In particular, we note that *Turner* was decided in 1983, and was reaffirmed by the Court of Criminal Appeals in 2004 in *Lane*. The Legislature has therefore been aware of the Court's interpretation of the Penal Code for over 35 years, but has not expressed its disagreement with the Court's interpretation by altering the language in the Code; instead, in subsequent revisions to the Code, it has used identical language to the version in place when *Turner* was first decided. Accordingly, we conclude that the Legislature has, at least tacitly, agreed with the Court's interpretation of the Code. *See generally Lockhart v. State*, 150 Tex.Crim. 230, 235, 200 S.W.2d 164, 167-68 (1947)(Legislature's failure to amend the law after Court rendered its interpretation was evidence that the Court's "construction of the law was as intended by the Legislature.").

designated for publication)(where defendant used his hands to both choke and strike his victim, his hands could be considered a deadly weapon); *Gillum v. State*, 888 S.W.2d 281, 288 (Tex.App--El Paso 1994, pet. ref'd)(recognizing that a defendant's fist or hands could be considered deadly weapons depending on the manner of their use).

In the present case, the jury was properly instructed that a "deadly weapon means anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." In turn, the jury received evidence, from both Appellant's own recorded police interview and from the medical examiner, that was sufficient to support a finding that Appellant used his arm in such a manner, when he placed Castanon in a deadly and forceful chokehold that not only fractured Castanon's neck but lead to his death by asphyxiation.

We therefore conclude that the trial court properly instructed the jury that it had the option of finding that Appellant used his "arm" as a deadly weapon under these circumstances.

Appellant's Issue Three is overruled.   The trial court certified Appellant's right to appeal in this case, and Appellant's trial attorney signed the certification; however, the certification does not bear Appellant's signature indicating that he was informed of his rights to appeal and to file a pro se petition for discretionary review with the Texas Court of Criminal Appeals. *See* Tex.R.App.P. 25.2(d).   The certification is defective and has not been corrected by the trial court. To remedy this defect, this Court ORDERS Appellant's attorney, pursuant to Tex.R.App.P. 48.4, to send Appellant a copy of this opinion and this Court's judgment, to notify Appellant of his right to file a pro se petition for discretionary review, and to inform Appellant of the applicable deadlines. *See* Tex.R.App.P. 48.4, 68.   Appellant's attorney is further ORDERED, to comply with all of the requirements of Tex.R.App.P. 48.4.

## CONCLUSION

The trial court's judgment is affirmed.


August 28, 2019

ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rodriguez, and Palafox, JJ.

(Do Not Publish)

17