**Opinion issued August 29, 2024**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-22-00841-CR

———————————

**ERIC CECILIO AGUILAR, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 178th District Court**
**Harris County, Texas**
**Trial Court Case No. 1673239**

---

# O P I N I O N

A jury found appellant Eric Cecilio Aguilar guilty of the offense of capital murder for committing a murder while in the course of committing, or attempting to commit, a robbery.[1] The trial court assessed his punishment at confinement for life,

---

[1] *See* TEX. PENAL CODE § 19.03(a)(2).

as statutorily required.[2]  It also entered an affirmative finding that he used a deadly weapon, namely a firearm, during the commission of the offense.

In a single issue on appeal, Aguilar contends that the trial court reversibly erred in denying his request to include an instruction on self-defense in the jury charge.

We affirm.

## Background

Nabeel Raza testified that complainant Zuhyr Kaleem ("Z") was one of his closest friends.  On the evening of Saturday, April 27, 2019, Z and Raza were scheduled to go to San Antonio with friends.  At around 7:00 p.m., while Z and Raza waited at Z's house for their friends to arrive, Z received a call from Jose Varela.  Raza heard the content of the call over Z's cell phone speaker.

Varela asked to buy two pounds of marijuana—a quantity worth $2,000 to $3,000—from Z.  He asked Z to meet him at a house for the transaction and told him to park his car and walk up to the garage.

Raza explained that Z regularly sold marijuana, but he normally sold in small quantities—3.5 to 7 grams.  Raza had accompanied Z many times on these sales, which typically took place in public parking lots.  Varela's request was "extremely

---

[2]     *See id*. § 12.31(a)(2) ("An individual adjudged guilty of a capital felony in a case in which the state does not seek the death penalty shall be punished by imprisonment in the Texas Department of Criminal Justice for . . . life without parole . . . .").

2

unusual," and Z "seemed like he knew something was off." Z put his gun in his backpack and left to meet with Varela, while Raza waited at Z's house. Raza expected that Z would be gone for 15 or 20 minutes. Z never returned.

Austin Walker, an accomplice witness, stated that, at the time of the events, Varela and Aguilar were his co-workers and close friends. They often "hung out" together in the garage at Varela's grandparents' house and smoked marijuana.

Walker testified that, at some point, Aguilar and Varela told him about a plan to rob and kill Z. Specifically, Varela planned to contact Z through text or Snapchat, ask to buy two pounds of marijuana, and lure Z to Varela's garage, where Aguilar would "shoot [Z] and take what he brought with him"—"weed and possibly some money." Walker's role was to wait down the street and text them when Z arrived. And another co-worker, Gannon Gottlieb, was going to dispose of Z's body.

On the day of the murder, Aguilar, Varela, and Walker were on their way to an arcade when Z texted that he "had the weed ready." Walker took Varela and Aguilar to Varela's house and then parked down the road. When Walker saw Z's white sedan approaching, Walker sent a text message to Varela and Aguilar.

According to Walker, Z parked and went into the garage, and the garage door closed behind him. Walker then heard gunshots—"6 of them." There were four shots "relatively fast" and then a "pause" and "two more." When the garage door

3

opened, Aguilar got into Z's car and drove away. Varela drove out of the garage in his Ford Mustang and headed to Gottlieb's house to dispose of Z's body.

Walker went to Walmart and bought paper towels, bleach, and trash bags to clean up the garage. While cleaning, he found bullet casings and Z's backpack, which contained marijuana, two cell phones, and two pistols. Walker noted that the plan was for Aguilar to use Varela's gun—a pistol that his grandfather had left him—to shoot Z. Walker recognized the gun in Z's backpack. Walker destroyed the cell phones and disposed of the paper towels and bullet casings in a Walmart dumpster.

Walker then went to Aguilar's apartment. When Aguilar arrived, he and Walker burned Z's credit cards. Afterwards, Walker drove to pick up Varela, who had driven Z's car to Mexico to meet with a friend and "get rid of [it]."

Subsequently, Walker, Varela, and Aguilar met at Varela's house and "did an inventory of the proceeds from the robbery." They divided up the marijuana, gave some to Gottlieb, along with money, and sold some on Snapchat. Walker noted that he and Aguilar later met up with a co-worker, "Richard," to sell him some of Z's marijuana, along with Z's and Varela's pistols.[3]

Walker further testified that Aguilar later told him about the events inside Varela's garage. Aguilar said that when Z arrived he pulled out the marijuana and

---

[3]    During the transaction, a disagreement ensued, and Walker, in a separate event, discharged his firearm into Richard's truck, killing Richard.

4

showed it to Varela, who was standing next to Z. Using Varela's gun, Aguilar shot at Z. He struck him "a couple of times," but "ran out of ammo." As Varela "wrestled Z down," Aguilar came around Varela's Mustang, which was parked inside the garage, to help. When Z tried to retrieve his own gun, Aguilar took Z's gun and shot him with it. Varela and Aguilar then put Z's body into the trunk of the Mustang.

Gottlieb testified that, at 1:00 p.m. on the day of the murder, Aguilar called and said he "needed that favor." Then, at 9:30 or 10:00 that night, Aguilar called and said he was on his way. Aguilar and Varela arrived at Gottlieb's house in two cars, and Gottlieb told them to drive around back.

In a pasture behind his house, Gottlieb helped Aguilar and Varela remove Z's body from the trunk of the Mustang. Z was dead, and his body was wrapped in plastic. Gottlieb helped clean the trunk. And Aguilar said he would return in a few days to pay him. Gottlieb then used a wheelbarrow to move Z's body to a car parked in a forested area on his property. Gottlieb noted that he could "definitely tell that [Z] was shot through the hand and through the chest." And there was an entry wound "into the palm of the hand."

The next morning, Gottlieb dug a hole three or four feet deep, placed Z into the hole, "said a prayer for him," and "lit him on fire." A day or so later, Aguilar and Walker showed up and paid him a "[b]ig jar of weed and about $300."

5

Harris County Sheriff's Office Deputy D. Lewis testified that Z's home security video showed that, on the day of the murder, Z left his house at 7:37 p.m. in his 2011 Honda Accord and never returned. Based on Snapchat records, Varela was the last person to have had contact with Z online. Varela admitted that the shooting took place in his garage and agreed to show officers where Z was taken. Subsequently, Varela, Walker, and Gottlieb each independently identified Aguilar.

Harris County District Attorney's Office, Digital Forensic Investigation Unit, Officer J. Vigil testified in detail regarding the sequential cellular communications that took place with Z and between Aguilar, Varela, Walker, and Gottlieb on the day of the murder and the two days after. Officer Vigil also testified about their cell phone locations during the events—including the subsequent crossings at the border.

The trial court admitted into evidence records from United States Customs and Border Protection (CBP) and the Texas Department of Motor Vehicles. Those records, along with the testimony of CBP Officer K. James, show that at 4:07 a.m. on April 28, 2019—the day after the murder—a white, four-door, 2011 Honda registered to Z crossed over the United States border into Mexico at the Port of Hidalgo, Texas. At 1:45 p.m. the same day, Varela crossed the border from Mexico back into the United States as a pedestrian. At 1:46 p.m., Walker also crossed the border at the same location as a pedestrian. And, at 3:10 p.m., a truck registered to

6

Walker, carrying a passenger, crossed through a border patrol checkpoint in Kingsville, Texas—heading north away from Mexico.

Texas Department of Public Safety Ranger C. Rainwater testified that Gottlieb showed officers the site where he had burned Z. Ranger Rainwater noted that several bones and a fired bullet were unearthed.

Montgomery County Forensic Services Director Dr. K. Pinneri examined the bones and tissue recovered from the burn site. There were defects in fabric pieces recovered that were consistent with gunshot wounds and a fired bullet "intimately mixed with these bones"—"suggest[ing] that the bullet was in this person's body."

Harris County Institute of Forensic Sciences Analyst L. Bauer testified that Z could not be excluded as a contributor to the DNA taken from the bones recovered at Gottlieb's house. She testified that the cause of death was homicidal violence.

Aguilar testified that, on the day of the shooting, he and Varela waited in Varela's garage for Z to arrive so they could buy two pounds of marijuana from him. When Z arrived, they opened the garage door and let him in. Z removed the marijuana from his backpack and placed it on Varela's Mustang parked inside.

According to Aguilar, the marijuana was brown and he told Z it was "crap." And Z "didn't take it too kindly." A verbal altercation ensued. Aguilar and Z were standing "[v]ery close" and "bowed up" to one another. Then Aguilar saw Z "go for his waistband," where he had a pistol. Aguilar stated that he saw Z's "hands go

7

down, so [Aguilar] went down with him," and they were "tussling for a gun." While they were "wrestling for the gun," Z's "gun went off," as follows:

> All I know is when we were wrestling for the gun, I felt it aim toward me, and my instinct, I turned it. And I guess, his finger was already on the trigger ready to pull. And I don't know, I guess did something [sic] and just the gun went off. And I don't know how many shots rang out, but I didn't mean to kill that kid.

Aguilar stated that "[i]f any more shots rang out, then it must have been from Varela." He later testified that Z's "gun just went off, and then [Varela] shot [Z]."

Aguilar admitted that he spoke with Gottlieb in the hours before the shooting and that, after the shooting, he and Varela put Z into the trunk of the Mustang and called Gottlieb. Varela drove the Mustang, while Aguilar drove Z's car, to Gottlieb's house in Plantersville. There, they removed Z's body from the trunk, placed him on the ground, and cleaned the car.

Aguilar also testified that, while he and Varela drove to Plantersville, Walker, who was "down the street" during the shooting, stayed behind to bleach the garage floor and dispose of the evidence. And he admitted that he burned Z's credit cards. Further, in the days after the murder, he went back to Gottlieb's house and gave him marijuana and cash, and then sold Z's marijuana and Z's and Varela's pistols. But Aguilar denied there was ever a plan to rob or kill Z.

Aguilar also admitted that he had previously given law enforcement officers three different versions of the events and that he had simply "said what was more

8

convenient" for him.  And, prior to his testimony at trial, he had never before claimed that Z had gotten mad at him during the drug transaction.

At the close of trial, Aguilar did not submit a proposed jury charge.  He also did not submit a written request to the trial court for an instruction on self-defense.  Instead, as discussed below, he simply made a general verbal request for a self-defense instruction—which the trial court denied.

The trial court's charge to the jury authorized it to find Aguilar guilty of the offense of capital murder or of the lesser-included offenses of murder or aggravated robbery.[4]  The jury found Aguilar guilty of capital murder.

### Charge Error

In his sole issue, Aguilar asserts that the trial court reversibly erred in denying his request for a self-defense instruction in the jury charge.  According to Aguilar, "there was some evidence, from [him], that . . . supports the elements of self-defense."  Relying on *Almanza v. State*, 686 S.W.2d 157 (Tex. Crim. App. 1984), he argues that he suffered "some harm" because "the jury had no way to apply the evidence that [he] provided" and "no option to believe him."

In response, the State argues that Aguilar failed to preserve his complaint for review because he did not adequately apprise the trial court of the grounds of his

---

[4]     *See* TEX. PEN. CODE § 19.03(c) ("If the jury . . . does not find beyond a reasonable doubt that the defendant is guilty of [capital murder], he may be convicted of murder or of any other lesser included offense.").

9

objection. And, even if he had preserved the issue, he was not entitled to a self-defense instruction as a matter of law. Further, he was not harmed—given the overwhelming evidence of his guilt.

*Preservation of Defensive Issues*

We first consider whether Aguilar preserved his complaint that the trial court erred by not including an instruction on self-defense in its charge to the jury. *See Williams v. State*, 662 S.W.3d 452, 460 (Tex. Crim. App. 2021) ("[P]reservation of error is a systemic requirement that must be reviewed by the courts of appeals. . . .").

**A.** *Defensive Issues*

Texas Code of Criminal Procedure article 36.14 imposes a duty on trial courts to "deliver to the jury . . . a written charge distinctly setting forth the law applicable to the case." TEX. CODE CRIM. PROC. art. 36.14. The charge should include "all of the law applicable to the criminal offense that is set out in the indictment," as well as general admonishments, i.e., presumption of innocence, proof beyond a reasonable doubt, and so forth. *Mendez v. State*, 545 S.W.3d 548, 552 (Tex. Crim. App. 2018) (internal quotations omitted). "These matters are always 'law applicable to the case.'" *Id.* And a trial court is required to instruct on these issues "sua sponte, even without prompting from counsel," because the trial court is "ultimately responsible for the accuracy of the jury charge and accompanying instructions." *Id.*

10

Thus, alleged jury-charge error with respect to the law applicable to a case "must be considered on appellate review regardless of preservation in the trial court." *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012); *see Huizar v. State*, 12 S.W.3d 479, 484 (Tex. Crim. App. 2000) (charge must instruct jury on "law applicable to the case" regardless of any request or objection).[5]

However, "Article 36.14 imposes no duty on trial courts to sua sponte instruct the jury on unrequested defensive issues," even on those raised by the evidence. *Posey v. State*, 966 S.W.2d 57, 59–60, 62 (Tex. Crim. App. 1998); *see Oursbourn v. State*, 259 S.W.3d 159, 179 (Tex. Crim. App. 2008). And because requests for defensive instructions "frequently depend upon trial strategy and tactic," they are not considered "law applicable to the case." *Williams*, 662 S.W.3d at 461. A trial court is not obligated to instruct the jury on them absent a proper request. *Id.*[6]

---

[5] "[I]f a defendant complains on appeal about an erroneous instruction (or lack of a proper instruction) regarding an area of the law that is considered the law applicable to the case," the *Almanza* framework applies. *Williams v. State*, 662 S.W.3d 452, 460–61 (Tex. Crim. App. 2021) (discussing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984)). Under that framework, "[e]rror preservation does not become an issue until harm is assessed because the degree of harm necessary for reversal depends upon whether the error was preserved." *Middleton v. State*, 125 S.W.3d 450, 453 (Tex. Crim. App. 2003); *see Mendez v. State*, 545 S.W.3d 548, 552 (Tex. Crim. App. 2018) (whether defendant objected to error simply determines which of *Almanza*'s dual standards of review applies to determine whether error is reversible).

[6] Notably, when "the complained-of error is the lack of a defensive instruction, the *Almanza* framework does not apply." *Williams*, 662 S.W.3d at 461; *Zamora v. State*, 411 S.W.3d 504, 513 (Tex. Crim. App. 2013) ("*Almanza* . . . does not apply to defensive issues"). However, if a trial court *does* charge on a defensive issue,

11

Accordingly, absent a proper request to the trial court, a defendant "cannot complain on appeal about the trial [court's] failure to include a defensive instruction." *Vega v. State*, 394 S.W.3d 514, 519 (Tex. Crim. App. 2013). That is, "he has procedurally defaulted any such complaint." *Id.*; *Zamora v. State*, 411 S.W.3d 504, 513 (Tex. Crim. App. 2013) (defensive issues "may be forfeited if not preserved at trial"); *see also Mays v. State*, 318 S.W.3d 368, 383 (Tex. Crim. App. 2010) ("The purpose of [this] rule is to prevent a party from 'sandbagging' the trial judge by failing to apprise him, and the opposing party, of what defensive jury instructions the party wants and why he is entitled to them.").

## B. *Error Preservation*

As a prerequisite to presenting a complaint for appellate review, Texas Rule of Appellate Procedure 33.1 requires that the record show that a complaint was made to the trial court by a timely request or objection that "stated the grounds for the ruling that the complaining party sought from the trial court with *sufficient specificity* to make the trial court aware of the complaint," unless the specific grounds were apparent from the context, and that the trial court either ruled or refused to do so. *See* Tex. R. App. P. 33.1 (emphasis added). "The purpose for requiring a timely, specific objection is twofold: (1) it informs the [trial court] of the basis of the

---

whether sua sponte on request, but fails to do so correctly, the error becomes subject to review under *Almanza*. *Vega v. State*, 394 S.W.3d 514, 519 (Tex. Crim. App. 2013). That is not the case here.

objection and affords [it] an opportunity to rule on it, and (2) it affords opposing counsel an opportunity to respond to the complaint." *Williams*, 662 S.W.3d at 460 (internal quotations omitted).

"Article 36.14 [also] provides guidance on preserving for review any exceptions or objections to the jury charge." *Id.* at 461. It states in pertinent part:

> Before [the] charge is read to the jury, the defendant or his counsel shall have a reasonable time to examine the same and *he shall present his objections thereto in writing*, *distinctly specifying each ground of objection*. Said objections may embody errors claimed to have been committed in the charge, as well as errors claimed to have been committed by omissions therefrom or in failing to charge upon issues arising from the facts . . . . *The requirement that the objections to the court's charge be in writing will be complied with if the objections are dictated to the court reporter* in the presence of the court and the state's counsel. . . .

TEX. CODE CRIM. PROC. art. 36.14 (emphasis added).

Under Article 36.14, the defendant must "either present his objections in writing or dictate them to the court reporter." *Williams*, 662 S.W.3d at 461. "'Magic words' are not required; a complaint will be preserved if *the substance of the complaint* is conveyed to the trial judge." *Bennett v. State*, 235 S.W.3d 241, 243 (Tex. Crim. App. 2007) (emphasis added). Stated differently, the party must apprise the trial court and the opposing party "of what defensive jury instructions the party wants *and why he is entitled to them*." *Mays*, 318 S.W.3d at 382–83 (emphasis added)). "[G]eneral or insufficiently specific objections do not preserve error for appeal." *Williams*, 662 S.W.3d at 462.

## C.     *Discussion*

Here, the trial court's charge authorized the jury to convict Aguilar of capital murder if it found that he, while in the course of committing or attempting to commit the robbery of Z, intentionally caused Z's death by shooting him with a firearm. And if it acquitted Aguilar of capital murder, it could consider whether he was guilty of the lesser-included offense of murder, i.e., whether he intentionally or knowingly causing Z's death by shooting him with a firearm. And if it acquitted Aguilar of murder, the jury could consider whether he was guilty of the lesser-included offense of aggravated robbery, i.e., whether, during the course of committing or attempting to commit theft, he intentionally or knowingly caused Z serious bodily injury by shooting him with a firearm.

The record before us does not reflect that Aguilar submitted a proposed charge or a written request for a self-defense instruction. *See* TEX. CODE CRIM. PROC. art. 36.14. Rather, the following discussion took place at the charge conference:

| | |
|---|---|
| THE COURT: | Have both sides had a chance to review the charge? |
| [The State]: | Yes, Your Honor. |
| [Aguilar's Counsel]: | Yes. |
| THE COURT: | Any objections, State? |
| [The State]: | No, Your Honor. |
| THE COURT: | Anything additional, [Aguilar's Counsel]? |
| [Aguilar's Counsel]: | Yes. Based on the facts that we've heard, the Defense would request an affirmative |

14

|  |  |
|---|---|
|  | defense of self-defense be included in the charge. |
| THE COURT: | Brief response, State? |
| [The State]: | Your Honor, for capital murder/robbery there is not a self-defense instruction. And he was, in [the] course, of committing a robbery, so there's no self-defense to murder. |
| THE COURT: | I see that being in the case law, so your request is denied. |

This discussion represents the entirety of Aguilar's request. The State argues that "it is clear from the record that both the State and the trial judge were unsure as to why [Aguilar] thought himself entitled to the charge." The State asserts that Aguilar failed to specify any basis for his request. Rather, he "stated only that he wanted it" and did not reply to the State's response.

Aguilar argues on appeal that he was entitled to the instruction based on his testimony at trial that Z had a gun, demonstrated an intent to use it, and was shot when Aguilar attempted to take it away from him. And Aguilar denied that there was ever a plan to rob Z.

But the issue here is not "whether the instruction is warranted by evidence at trial." *See Williams*, 662 S.W.3d at 463. Rather, we are addressing, "in the first instance, whether the grounds for the request would have been obvious to the trial court so that any error in failing to give the instruction was preserved for appeal." *Id.* We must consider whether Aguilar's request for "an affirmative defense of self-defense" "[b]ased on the facts," without more, was sufficiently specific to apprise

15

the trial court and the State of the instruction he wanted and why he was entitled to it. *See* TEX. CODE CRIM. PROC. art. 36.14 (defendant "shall . . . distinctly specify[] each ground of objection"); TEX. R. APP. P. 33.1(a)(1)(A) (requiring "sufficient specificity" to make trial court aware of complaint); *Mays*, 318 S.W.3d at 382–83 (party must apprise trial court and opposing party "of what defensive jury instructions [he] wants and why he is entitled to them").

An imperfect objection is sufficient to preserve error "if the record indicate[s] that the trial judge understood [the] request to encompass the matters about which appellant now complains." *Bennett*, 288 S.W.3d at 243 n.9. We examine the trial court's statements in the record, the general theme of the defensive evidence, and the defensive theories presented at trial. *See Rogers v. State*, 105 S.W.3d 630, 640 (Tex. Crim. App. 2003).

Here, it is clear from the discussion at the charge conference that the State and trial court understood Aguilar's request to be for an instruction on self-defense as applied to the primary offense of capital murder—a murder that took place during the course of a robbery.

It is well-established under Texas law that a "robber has no right of self-defense against his victim." *Westley v. State*, 754 S.W.2d 224, 230 (Tex. Crim. App. 1988); *see* TEX. PENAL CODE § 9.31(b)(4) (use of force against another not justified if actor provoked use or attempted use of unlawful force). Because a defendant

16

charged with the offense of robbery "has no legal right to claim self-defense against his intended victim," he is "therefore not entitled to receive a self-defense instruction." *Macias v. State*, No. 08-17-00144-CR, 2019 WL 4058584, at *5 (Tex. App.—El Paso Aug. 28, 2019, pet. ref'd) (not designated for publication). Courts have held that a defendant charged with capital murder—based on a theory that he committed murder during the course of committing or attempting to commit a robbery—is likewise not entitled to a self-defense instruction. *See Blackmon v. State*, 926 S.W.2d 399, 405 (Tex. App.—Waco 1996, pet. ref'd) (holding that trial court properly refused to instruct jury on self-defense in capital murder based on murder committed in course of robbery because robber has no right of self-defense against his victim); *see also Russell v. State*, No. 05-17-00124-CR, 2018 WL 525559, *9– 10 (Tex. App.—Dallas Jan. 24, 2018, pet. ref'd) (mem. op., not designated for publication); *Douglas v. State*, No. 05-06-00198-CR, 2006 WL 3742902, at *4 (Tex. App.—Dallas Dec. 21, 2006, pet. ref'd) (mem. op., not designated for publication).

Similarly here, Aguilar was not entitled to a jury instruction on self-defense for robbery or for capital murder based on a robbery theory.

In his brief, Aguilar argues that the trial court erred in not including an instruction on self-defense because he "denied any intention to rob [Z]" and "admits that he intentionally grabbed [Z] in order to get the gun away from him when the gun discharged." Thus, the gravamen of Aguilar's complaint on appeal is that the

trial court erred in denying a self-defense instruction with respect to the lesser-included offense of murder.

Although the jury could have chosen to reject the robbery allegation, and therefore the capital murder based on that theory, Aguilar did not request that an instruction on self-defense be included in the application paragraph for the lesser-included murder. *See, e.g.*, *Moore v. State*, 969 S.W.2d 4, 13 (Tex. Crim. App. 1998) ("If the appellant was justified in killing Clark in self-defense, then he did not murder Clark; if he did not murder Clark, then the murder of Boyd was not capital murder, since the appellant did not murder more than one person."); *Douglas*, 2006 WL 3742902, at *4 (holding that trial court did not err in denying request for self-defense instruction as to capital murder based on murder committed in course of robbery because robber has no right of self-defense against his victim and that charge correctly applied self-defense instruction only to lesser-included offense of murder).

In *Bennett*, the defendant requested a self-defense instruction in the trial court as follows:

> I respectfully request that the Court include in the charge an instruction concerning the law on self-defense, would be the defendant's position, based upon the totality of all the circumstances and all the witnesses, that it was testified during the trial of this case that a—that the—that the justification of self-defense has been raised by the evidence and, therefore, we object to—we object to that being not included. And we respectfully request that the Court charge the jury on the law of self-defense as it relates to this case.

235 S.W.3d at 242. The defendant later complained on appeal that the trial court erred in failing to submit a jury instruction on defense of a third person. *Id.*

The Texas Court of Criminal Appeals in *Bennett* noted that self-defense and defense of a third person are separate defenses under the Penal Code. *Id.* at 243. Thus, "a request with respect to the former does not by itself alert the trial judge with respect to the latter." *Id.* And it was not persuaded by the defendant's contention that the trial court "should have been aware of her complaint because defense counsel used the words 'in this case' and because evidence at trial existed that would have supported the submission" of a different instruction. *Id.* The court reasoned:

> We do not require a trial judge to mull over all the evidence introduced at trial in order to determine whether a defendant's request for a jury instruction means more than it says. "Magic words" are not required; a complaint will be preserved if the substance of the complaint is conveyed to the trial judge.

*Id*. at 243. The court held that the defendant's complaint did nothing more than convey that she wanted an instruction on self-defense. *Id.* And because she failed to place the trial court on notice of the instruction she wanted, her request was not preserved. *Id.* at 242.

Similarly here, Aguilar stated only that he wanted "an affirmative defense of self-defense" "[b]ased on the facts." And when the State and trial court made clear that they understood his request as seeking an instruction with respect to the primary offense of capital murder—a murder that took place during the course of a robbery—

19

for which self-defense is not available as a matter of law, Aguilar failed to clarify his request or offer any basis for it.

"To avoid forfeiture of a complaint on appeal, all a party has to do is let the trial judge know what he wants *and why he thinks he is entitled to it* and do so clearly enough for the judge to understand the request at a time when the trial court is in a proper position to do something about it." *Bedolla v. State*, 442 S.W.3d 313, 316 (Tex. Crim. App. 2014) (emphasis added). Aguilar's general request here did nothing more than convey that he wanted an instruction on self-defense—without any specification or explanation. *See Bennett*, 235 S.W.3d at 243. "[G]eneral or insufficiently specific objections do not preserve error for appeal." *Williams*, 662 S.W.3d at 462. And the trial court was not required to "mull over all the evidence introduced at trial in order to determine whether [his] request for a jury instruction mean[t] more than it says." *See Bennett*, 235 S.W.3d at 243.

Based on all of the foregoing, we conclude that Aguilar's general verbal request to the trial court was not sufficiently specific to meet the requirements of Article 36.15 or Rule 33.1. *See* TEX. CODE CRIM. PROC. art. 36.14 (defendant "shall . . . distinctly specify[] each ground of objection"); TEX. R. APP. P. 33.1(a)(1)(A) (requiring request "with sufficient specificity" to make trial court aware of complaint); *Mays*, 318 S.W.3d at 382–83 (party must apprise trial court and opposing party "of what defensive jury instructions the party wants and why he

20

is entitled to them"); *Jackson v. State*, 288 S.W.3d 60, 64 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd) (holding that appellant waived error where nothing in record indicated that trial court understood his request for jury instruction on "self-defense" meant more than he said). As a result, Aguilar's complaint on appeal is not properly before us.

## Conclusion

We affirm the trial court's judgment in all things.


Terry Adams
Chief Justice

Panel consists of Chief Justice Adams and Justices Landau and Rivas-Molloy.

Publish. TEX. R. APP. P. 47.2(b).